Robert M. GOLDBERG and George
Goloff, Plaintiffs,

v.

CABLEVISION SYSTEMS CORPO-
RATION, a Delaware Corpora-
tion, Defendant.

No. CV 99–1678.

United States District Court,
E.D. New York.

Oct. 8, 1999.

Thomas J. Hillgardner, Flushing, NY,
for plaintiffs.

Rivkin, Radler & Kremer, by William M.
Savino, Uniondale, NY, for defendant.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

Plaintiff Robert Goldberg ("Goldberg"
or "Plaintiff") is an individual who offers
independently produced programming for
cablecast on the channel designated for
public access use on the Cablevision of
Long Island ("Cablevision") cable televi-
sion system.[1] Goldberg commenced this ac-

---

1. "Cablevision of Long Island" is a cable sys-
tem division of Cablevision Systems Long Is-
land Corporation, which, in turn, is a wholly
owned subsidiary of a company known as

CSC Holdings, Inc. For purposes of this opin-
ion, the court will refer only to "Cablevision"
as the relevant cable system operator and
defendant.

tion, by way of order to show cause, seeking to enjoin Cablevision from refusing to cablecast Goldberg's program in its entirety. The dispute between the parties centers on defendant's refusal to carry the final twenty-five seconds of Goldberg's show, during which Goldberg offers for sale tapes and transcripts of his program. Claiming that such programming amounts to prohibited commercial use of the public access channel, defendant has refused to carry this segment. Arguing that defendant is violating state and federal law by engaging in prohibited editorial control over public access programming, plaintiff seeks an order requiring defendant to carry Goldberg's program in its entirety.

This case has been submitted to the court on the basis of an agreed statement of facts pursuant to Rule 56.1 of the rules of this court. Accordingly, the court considers the case as cross-motions for summary judgment. Finding no need to conduct any further hearings on this matter, the court rules herein on the parties' motions.[2]

## BACKGROUND

### I. Public Access Programming

When a cable system operator contracts to provide cable service to a community the operator must enter into an agreement with local authorities allowing for the installation of all necessary equipment in the public streets. As part of the consideration an operator gives for this right, local governments typically require cable companies to set aside certain channels for "public, educational or governmental purposes." *Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) ("Denver Area") (citations omitted). Such programming is commonly referred to as "PEG" programming—the "P" in PEG refers to public access programming. *See Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 920 (2d Cir.1997).

Because only a limited number of cable systems can operate within a community, the availability of public access channels which require a cable company to carry programs not originating with the company, promotes diversity in programming. *See* S.Rep. 102–92, reprinted in, 1992 U.S.C.C.A.N. 1133, 1991 WL 125145 * 100, 136. Thus, public access channels have been described as the "video equivalent of the speaker's soapbox or the electronic parallel to the printed leaflet." Such outlets "provide groups and individuals with the opportunity to become sources of information in the electronic marketplace of ideas." H.Rep. No. 98–934, reprinted in, 1984 U.S.C.C.A.N. 4655, 1984 WL 37495 * 28. Importantly, public access channels are recognized as available "to all, poor and wealthy alike...." H.Rep. No. 98–934, reprinted in, 1984 U.S.C.C.A.N. 4655, 1984 WL 37495 * 39–40.

### II. Leased Access

The commercial counterpart to public access channels are "leased access" channels. Leased access channels are those reserved for commercial lease by third parties unaffiliated with the cable system operator. *Denver Area*, 518 U.S. at 734, 116 S.Ct. 2374. Like public access channels, leased access channels are created pursuant to the cable operator's agreement with local governments. By requiring cable companies to lease channels to entities unaffiliated with the system operator, leased channels, like PEG channels, further the interest of cablecasting diverse views. Unlike PEG channels, however, information communicated on leased access channels may include commercial advertising. *See Loce v. Time Warner Entertainment*, 1999 WL 387150 *8 (2d Cir.1999).

### III. Public Access and Leased Access Programming: Statutory and Regulatory Framework

The statutory framework within which PEG and leased access programming oper-

---

**2.** Goldberg is one of two plaintiffs herein. Plaintiff George Goloff is also a producer of public access programming. His case, however, is not yet ripe for adjudication.

ates exists at both the federal and state level. The federal government recognizes the practice of local governments (referred to as the "franchising authority") requiring that channel capacity be designated for PEG use. The Cable Communications Policy Act of 1984 and the Cable Television Consumer Protection Act of 1992 (the "Cable Act"), both of which amended the Communications Act of 1934, provide that a franchising authority may establish requirements in a franchise for such use only to the extent provided for by federal law. *See* 47 U.S.C. § 531(a). That law provides that cable operators may not exercise any editorial control over programming carried on PEG channels. A cable operator may, however, refuse to accept PEG programming that contains "obscenity, indecency or nudity." 47 U.S.C. § 531(e).

Federal law also recognizes the importance of leased access programming and provides for the setting aside of such channels. 47 U.S.C. § 532; *See Loce v. Time Warner Entertainment,* 191 F.3d 256, 264 (2d Cir.1999) Thus, pursuant to the Cable Act, producers of programs unaffiliated with the cable operator may pay a fee to the cable operator and have their programs cablecasted, along with any commercial advertising, on the leased access channel. *Loce,* at 264. Like the provision with respect to PEG channels, the cable operator is prohibited from exercising any editorial control over programming carried on leased access channels.

New York State regulation of PEG programming defines the term "public access channel" as a channel designated for "non-commercial use by the public on a first-come, first-served, nondiscriminatory basis." 9 NYCRR 595.4(a)(1). Applicable state law, like federal law, provides that a cable television franchisee may not exercise editorial control over programming on PEG or leased access channels. Thus, the New York Public Service Law provides that "no cable television company may prohibit or limit any program ... presented over a leased channel or any channel made available for public access or educational purposes." N.Y.Pub.Serv.L. § 229(3).

Applicable regulations provide that cable television franchisees may not exercise editorial control over PEG usage of channel capacity designated for such purposes. NYCRR 595.4(c)(8). It is further provided that a municipality may not exercise editorial control over any use by the public of a public access channel. 9 NYCRR 595.4(c)(9). The New York State regulation further specifies that cable television franchises may include additional provisions concerning the use of PEG access channels that are consistent with federal and state law. 9 NYCRR § 595.4(e)(2).

### IV. *The Public Access Agreements At Issue Here*

Cablevision is the cable system operator in the Town of Oyster Bay (the "Town"). Like other cable system operators, Cablevision has entered into an agreement with local authorities giving Cablevision, as the system operator, the right, *inter alia,* to install cable equipment in the public streets. The Town, like most local governments entering into agreements with cable operators, requires Cablevision to set aside certain channels for PEG usage.

Cablevision's operations in the Town are governed pursuant to an agreement known as a franchise agreement (the "Franchise Agreement"). In addition to requiring that Cablevision provide cable service to properties within the Town, the Franchise Agreement requires the company to provide certain channels for PEG access usage. PEG access usage is defined as the right of access of, *inter alia,* Town residents, to submit "non-commercial programs to [Cablevision] for cablecasting on PEG Access channels in accordance with rules established and administered by the FCC, NYSPSC [New York State Public Service Commission] and [Cablevision]." Franchise Agreement ¶ 1.18. The Franchise Agreement states specifically that Cablevision is to comply with federal and state law and regulations requiring and pertaining to PEG access. Franchise Agreement ¶ 16.1. Cablevision is respon-

sible for developing rules for PEG access that will ensure that PEG access equipment is available "on a first-come nondiscriminatory basis." Franchise Agreement ¶ 16.4.

Pursuant to its responsibilities set forth in the Franchise Agreement, Cablevision has developed "PEG Access" rules (the "Cablevision Rules"). The Cablevision Rules govern the availability and use of PEG access channels. The "Public Access Channel" which is the channel at issue here, is defined as the channel designated by Cablevision for the presentation of public access programming by, *inter alia*, individuals who resides within Cablevision's service area. Cablevision Rules ¶ 2(f). The Cablevision Rules expressly prohibit the commercial use of PEG access channels. Thus, the Rules provide that any program that "promotes or is designed to promote the sale of commercial products or services ... or designed for fund raising of any nature or kind is prohibited" in connection with PEG access programming. Cablevision Rules ¶ 3(d).

## V. *The Parties and Their Dispute*

Plaintiff is a resident of the Town. His program, entitled "America's Defense Monitor" has been cablecasted over Cablevision's public access channel. In connection with the cablecast of his program, Goldberg entered into a contract with Cablevision known as the "Access User Contract." This contract incorporates the terms of the Cablevision Rules, including the prohibition on commercial use of the public access channel.

On February 5, 1999, Cablevision's Director of Programming wrote to Goldberg regarding America's Defense Monitor (the "February 5 Letter"). The February 5 Letter refers to the prohibition on commercial use of the public access channel and states that the "graphic of a Visa/MC logo and voice over at the end of the program requesting $19.95 for a copy of the tape is clearly in violation" of the rule. The February 5 Letter further states that Cablevision would be happy to continue cablecasting Goldberg's program if this

"commercial portion" of the program were removed.

Goldberg, who is apparently unwilling to cablecast America's Defense Monitor, without the segment advertising the sale of videotapes or transcripts of the show, subsequently commenced this proceeding.

## VI. *The Complaint*

Goldberg's complaint contains six causes of action. First, Goldberg seeks relief pursuant to the Cable Act, 47 U.S.C. § 531(e). Second, relief is sought pursuant to New York Public Service Law § 229(3). Plaintiffs' third cause of action alleges a violation of his civil rights and seeks relief pursuant to 42 U.S.C. § 1983. Plaintiffs' sixth cause of action seeks reformation of the Access User contract. Finally, the fourth and fifth causes of action seek attorneys' fees pursuant to 42 U.S.C. § 1988 and 47 U.S.C. § 531, respectively. Goldberg seeks money damages along with injunctive relief "restraining Cablevision from exercising any editorial control over the content of plaintiff Goldberg's public access programming submitted for cablecast ... unless defendant deems said programming to contain obscenity, indecency or nudity."

While Goldberg sets forth various causes of action, the factual underpinnings of each are the same. Essentially, Goldberg alleges that Cablevision's refusal to cablecast America's Defense Monitor, in its entirety, amounts to an attempt to exercise editorial control over the program, which control is clearly prohibited by federal and state law. Specifically, it is argued that Cablevision does not have the right to refuse to cablecast a public access program solely on the ground that the program is commercial in nature. Goldberg argues that Cablevision may refuse to cablecast a program only if it contains "obscenity, indecency or nudity" as set forth in 47 U.S.C. § 531(e). Plaintiff further argues that even assuming that Cablevision may properly refuse to carry commercial programming on the public access channel, the segment of "America's

Defense Monitor" that is in dispute is not commercial in nature.

## DISCUSSION

I. *The Commercial Nature of the Prohibited Segment*

■ Taking the second part of Goldberg's argument first, the court has no difficulty finding that the prohibited segment of America's Defense Monitor is commercial in nature. There is no doubt that in this final segment, for whatever reason, Goldberg is offering tapes and transcripts of the program for sale. Plainly, Goldberg is offering to enter into a commercial transaction with his viewers. Thus, the final segment of the program falls within the "core notion of commercial speech—'speech which does no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), quoting, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

It matters not that the proceeds of the proposed sales, as set forth in Goldberg's employee's affidavit, constitute a "very small income stream." Affidavit of Mark Sugg at ¶ 7. Nor does it matter that the stated purpose of the sale is to encourage "responsible persons to reproduce" the program "and to further disseminate" the program's points of view. *Id.* at ¶ 5. Speech may be characterized as commercial in nature "notwithstanding the fact that [it contains] discussions of important public issues ..." *Bolger*, 463 U.S. at 68, 103 S.Ct. 2875. The link of the sale of the tapes and transcripts to a matter of public debate does not detract from the commercial nature of the proposed transaction. *Id.* Moreover, it is clear that Cablevision's refusal to carry the final portion of Goldberg's program does not interfere with his ability to communicate his message. As noted, Goldberg is free to utilize the public access system to cablecast that portion of his program that disseminates information without proposing a commer-

cial transaction. In sum, the court agrees with Cablevision that the final segment of Goldberg's program is properly characterized as commercial programming.

II. *The Propriety of Prohibiting Commercial Use of Public Access Channels*

■ Having determined that the segment of America's Defense Monitor that Cablevision refuses to cablecast is commercial in nature, the question before the court is whether Cablevision may lawfully prohibit such commercial use of public access programming time.

As noted above, both the Cable Act and relevant New York State law expressly prohibit cable operators from exercising editorial control over the content of public access programming. *See* 47 U.S.C. § 531(e); 9 NYCRR 595.4. The single exception to this prohibition is the cable operator's right to refuse to cablecast material that is obscene. *See* 47 U.S.C. § 531(e).

That the obscenity exception is the single basis upon which a cable operator may exercise editorial control over public access programming was made clear recently in *Moss v. Cablevision Systems Corporation*, 22 F.Supp.2d 1, 6 (E.D.N.Y.1998). There, the cable system operator refused to carry a particular public access program because the program violated the company's policy against allowing public access time to political parties sixty days prior to an election. The court in *Moss* noted that the plain language of the Cable Act allowed editorial control only in the case of obscenity and entered an injunction prohibiting the cable company from refusing to cablecast the program. *See Moss* 22 F.Supp.2d at 6.

If this were a case of a cable operator refusing to cablecast a program, or parts thereof, solely on the ground of non-obscene content, the court would have no difficulty ordering the requested injunctive relief. This case is different however, in a critical aspect, from *Moss*. This is not a

case where editorial control is sought. Instead, Cablevision seeks only to bar the commercial aspect of the program from public access use—the final twenty-five seconds in which Goldberg seeks to sell tapes and transcripts of the program. This commercial use of PEG programming time is not protected by the laws referred to above for the simple reason that this aspect of the program does not fall within the definition or intent of public access programming, but, instead, constitutes the type of programming that is contemplated by the leased access provisions of federal and state law.

The very essence of public access programming is its non-commercial nature. New York State regulations explicitly define the "public access channel" as a "channel designated for noncommercial use by the public. . . ." 9 NYCRR 595.4. Both the Franchise Agreement and the User Access Agreement recognize the noncommercial nature of the public access channels. Thus, the Franchise Agreement defines PEG channels as "non-commercial." The User Access Agreement incorporates the Cablevision Rules which provide that any programming material that is designed to promoted the sale of goods or services is prohibited in connection with public access programming.

That both federal and state law have drawn a distinction between public access and leased access use of cable channels is significant. Regulations providing for PEG and leased access programming recognize the need to promote diversification in the cable industry. *See e.g.,* S.Rep. 102–92, reprinted in, 1992 U.S.C.C.A.N. 1133, 1991 WL 125145 * 100. Both allow individuals to communicate their messages to the general public. Regulations providing for these outlets thus further the important governmental interest in maintaining a "free market of ideas and an informed and well-educated citizenry." S.Rep. 102–92, reprinted in, 1992 U.S.C.C.A.N. 1133, 1991 WL 125145 * 102. PEG stations, in particular, further the "substantial and governmental and First Amendment interest in ensuring that cable subscribers have ac-

cess to local noncommercial educational stations to further education and promote diversity and alternative telecommunication services." *See* S.Rep. 102–92, reprinted in, 1992 U.S.C.C.A.N. 1133, 1991 WL 125145 * 136.

The important difference between public access and leased access programming is the commercial nature of the latter. The legislative history to the Cable Communications Policy Act of 1984 draws this clear distinction. It states that while both public access and leased access programming are available to the public, leased access describes "access channels set aside for commercial purposes, as opposed to PEG use." S.Rep. 98–934, reprinted in, 1984 U.S.C.C.A.N. 4655, 1984 WL 37495 *67. That legislative history further states that "[t]he term commercial use us employed to distinguish from public access uses which are generally afforded free to the access user, whereas third party leased access envisioned by this section will result from a commercial arrangement between the cable operator and the programmer . . ." S.Rep. 98–934, reprinted in, 1984 U.S.C.C.A.N. 4655, 1984 WL 37495 *68.

A program producer who wishes to use public access time to enter into commercial transactions should not be allowed to take advantage of the availability of free cable time that was clearly intended for noncommercial use. If such a producer of a program, unaffiliated with the cable operator, wishes to cablecast commercial material, that program is properly cablecasted on a leased access channel. *See Time Warner,* 118 F.3d at 930 (the needs of the viewing public for a "diversified range of traditional commercial programming can be adequately met by the numerous non-PEG channels and the leased channel opportunities that Congress has required"). If, on the other hand, there is no commercial element to a program, it is properly submitted as a public access program.

To allow Goldberg to use public access programming to propose commercial transactions would violate the Franchise

Agreement and the User Access Agreement and would amount to a misuse of channels specifically reserved for free public access use. As noted by the Second Circuit, "it is precisely because much of PEG programming has a limited, often specialized audience whose needs are not otherwise met that makes it important not to divert PEG channels to non-PEG purposes." *Time Warner*, 118 F.3d at 929–930.

In view of the court's holding that Cablevision has not violated the editorial control provision of the Cable Act, the court also necessarily holds that there has been no violation of the parallel provision of New York State law. *See Glendora v. Marshall*, 947. F.Supp. 707, 712 (S.D.N.Y. 1996) (dismissing Public Service Law claim where plaintiff could not succeed on Cable Act claim). The factual findings underpinning this decision also negate the validity of any civil rights or attorneys' fee claims.[3]

## CONCLUSION

For the foregoing reasons, the court grants summary judgment to defendant with respect to the claims of plaintiff Goldberg. The parties are to contact the court within twenty days of the date of this Memorandum and Order to advise the court as to the status of the claims of the remaining plaintiff.

SO ORDERED

---

**3.** The court notes that defendant expressed an intent to move for summary judgment on the civil rights claims on separate grounds. The court's ruling on the merits of Plaintiff's other causes of action renders such motion practice unnecessary.