Robert M. GOLDBERG,
Plaintiff–Appellant,

v.

CABLEVISION SYSTEMS CORPO-
RATION, a Delaware Corpora-
tion, Defendant–Appellee.

No. 99–9411.

United States Court of Appeals,
Second Circuit.

Argued May 25, 2000.

Decided Aug. 14, 2001.

Thomas J. Hillgardner, Jamaica, NY, for Plaintiff–Appellant.

William M. Savino, Rivkin, Radler & Kremer, LLP (Charles A. Forma, of counsel), Uniondale, NY, for Defendant–Appellee.

Before: LEVAL and SACK, Circuit Judges, and GOLDBERG, Judge.*

SACK, Circuit Judge:

On March 25, 1999, Plaintiff–Appellant Robert M. Goldberg brought this lawsuit against Defendant–Appellee Cablevision Systems Corporation in the United States District Court for the Eastern District of New York. Goldberg's complaint alleges that the defendant unlawfully refused to cablecast an independently produced program that he had submitted to a public access channel on one of the defendant's cable systems unless he deleted a twenty-five second closing segment informing viewers how to purchase transcripts and videotapes of the program from a third party. On October 8, 1999, the district court (Leonard D. Wexler, *Judge*) granted summary judgment in favor of the defendant. Goldberg appeals.

## BACKGROUND

An appreciation of the ultimate issues on appeal requires an understanding of the mix of federal and state law under which we consider Goldberg's claims.

### I. Statutory Framework

#### A. Federal Law

Recognizing that "over the years, local governments have required cable system operators to set aside [channels] for public, educational, or governmental ["PEG"] purposes as part of the consideration an operator gives in return for permission to install cables under city streets and to use public rights-of-way," *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (plurality opinion of Breyer, J.), Congress enacted the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 521, *et seq.* The Cable Act seeks to promote this type of arrangement within a nationally uniform structure by providing that a "franchising authority," typically a local government or municipality,[1] may require a cable operator to make channel capacity available for "PEG access programming"[2] as part of the franchise agreement pursuant to which the cable operator provides services to a community. *See* 47 U.S.C. § 531.[3] The Act further

---

* The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

1. A "franchising authority" is "any governmental entity empowered by Federal, State, or local law to grant a [cable television] franchise." 47 U.S.C. § 522(10).

2. We use the term "public access channel" to refer to a channel on a cable operator's sys-
tem devoted to "public access" as opposed to "educational" or "governmental" programming.

3. "Leased access" channels, in contrast to PEG channels, are channels required by federal law to be reserved for commercial lease by outside parties. *See* 47 U.S.C. § 532(b)(1). They must account for between 10 and 15 percent of a cable system's channels, depend-

allows a franchising authority to "require rules and procedures for the use of the channel capacity designated" for PEG programming and to "enforce any requirement in any franchise [agreement] regarding the providing or use of such channel capacity." *Id.* § 531(b), (c).

Two additional aspects of federal law are central to this appeal. First, Congress has prohibited cable operators from exercising "editorial control" over PEG programming, except that a cable operator may refuse to transmit all or a portion of "a public access program which contains obscenity, indecency, or nudity." *Id.* §§ 531(e), 544(d)(1). And second, Congress has not defined what "public, educational, or governmental purposes" means. That task is left to state law and to the terms of individual franchise agreements, subject to the condition that the content of the resulting channels must comport generally with preexisting industry practice. *See Denver Area*, 518 U.S. at 790, 116 S.Ct. 2374 (Kennedy, J., concurring in part and dissenting in part).

### B. State Law

The New York Public Service Commission, which oversees cablecasting in the State, *see* N.Y. Pub. Serv. L. §§ 211–30, promulgates certain minimum standards that are incorporated by law into every franchise agreement. Those standards include "provisions regarding access to, and facilities to make use of, channels for edu-

cation and public service programs," *id.* § 215(2)(b), and require that all "cable television franchisee[s] . . . designate channel capacity for PEG access." N.Y. Comp. Codes R. & Regs. tit. 9, § 595.4(b).[4] Filling the gap left by federal law, regulations issued by the Commission define a "public access channel" as "a channel designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis." *Id.* § 595.4(a)(1). And like their federal counterparts, these provisions state that a "cable television franchisee shall not exercise any editorial control over any public, educational or governmental use of channel capacity designated for PEG purposes." *Id.* § 595.4(c)(8).[5] According to the regulations, franchise agreements "may include any other provision[s] concerning the designation and use of channel capacity for [PEG] access consistent with Federal and State law." *Id.* § 595.4(e)(2).

### II. The Parties, Franchise Agreement, and Relevant Events

The facts underlying this lawsuit are not in dispute. Goldberg is a resident of the Town of Oyster Bay, New York. CSC Holdings Inc. ("CSC"), previously named and sued in the district court as Cablevision Systems Corporation, is the owner of Cablevision Systems Long Island Corporation, the cable operator that provides citizens of Oyster Bay with service pursuant to a franchise agreement between CSC and the town.[6]

---

ing on the total capacity of the system. *See id.* The use of such channels is not at issue in this appeal.

**4.** Specifically, regulations provide that "[t]he franchisee of a cable television system with a channel capacity of 21 or more channels shall designate . . . at least one full-time activated channel for public access use." *Id.* § 595.4(b)(1).

**5.** In addition, a New York Public Service Law under which Goldberg sued in the district

court prohibits cable television companies from barring or limiting any program or class or type of program presented on a public access channel. *See* N.Y. Pub. Serv. L. § 229(3).

**6.** CSC Holdings Inc. has not challenged at any point in this litigation Goldberg's assertions that CSC, rather than its wholly owned subsidiary, Cablevision Systems Long Island Corporation, is responsible for the actions that are the subject of his amended complaint and this appeal.

The franchise agreement requires CSC to provide at least thirty-six active channels, two of them exclusively for PEG access programming. Consistent with state law, a "PEG Access Channel" is defined in the agreement as "the channel or channels on which non-commercial PEG Access programming is cablecast." "PEG Access," in turn, "mean[s] the right to public, educational and governmental access that Town residents, its schools, its libraries, as well as the Town government have to submit non-commercial programs to [CSC] for cablecasting on PEG Access channels in accordance with rules established and administered by the FCC, [the New York State Public Service Commission,] and [CSC]." Under the franchise agreement, CSC is "responsible for developing, implementing, interpreting and enforcing rules for PEG Access Channel use."[7] The terms of the franchise agreement also provide that CSC must comply with "Federal and State law and regulations requiring and pertaining to [PEG] access."

In order to provide programming on CSC's public access channel, Goldberg entered into an Access User Contract under which he agreed to comply with CSC's "Access Rules." Access Rule 3(d) provides that

> [a]ny audio or visual material [that] promotes or is designed to promote the sale of commercial products or services (including advertising by or on behalf of, or in opposition to, candidates for public office) or designed for fund raising of any nature or kind is prohibited in connection with any Access Programming.[8] Any program which contains any material designed to elicit a response or any

other solicitation of names or addresses which may be used for future fundraising [sic] activities may be rejected by Cablevision in its sole and absolute discretion. Notwithstanding the above, "billboard" type notices announcing the source of funding (if any) for the production of the program are permitted.

(Footnote added).

Goldberg offered a program produced and distributed by the Center for Defense Information ("CDI") called "America's Defense Monitor" for cablecasting on one of CSC's public access channels. According to CDI's Director of Television, the "America's Defense Monitor" program is one of many media through which CDI furthers its primary objective of sharing its views on military issues. Various installments of the program were in fact cablecast by CSC on its public access channel.

On February 5, 1999, CSC's Director of Programming informed Goldberg that the then-latest installment of the program violated Access Rule 3(d) because the final twenty-five seconds of the program, after the credits had run, contained a "graphic of a Visa/MC logo and a voice over ... requesting $19.95 for a copy of the tape" from CDI. A transcript of the program was also advertised at a price of $5. After the commencement of this lawsuit but prior to the decision of the district court, the closing segment was changed to reflect an increase in the price of the videotape to $39 per copy. CDI concedes that the price of the videotape advertised in the transaction proposed by the "offending" segment "cover[s] the cost of a blank videotape and

---

7. Although the Town has the option to delegate the operation of the public access channel to a third party, so far as we can tell from the record, it has not done so.

8. "Access Programming" is defined in the Access Rules as "[v]ideo and audio material provided by Access Channel Users on the [PEG] Access Channel(s), which programming concerns matters of interest to and/or is about Cablevision's service area."

the cost of having the program dubbed onto the blank videotape and provide[s] CDI with a little money left over ... and is a very small income stream for CDI." Goldberg is not the seller of the tapes, nor does he obtain profits from the sale.

CSC indicated that it would schedule a cablecast of "America's Defense Monitor" once the disputed segment was removed. For each subsequent installment of "America's Defense Monitor" that Goldberg has submitted to CSC for cablecasting on the public access channel, he has excised the segment that CSC indicated ran afoul of the Access Rules. This takes Goldberg about an hour for each such program.

### III. Procedural History

Goldberg instituted this lawsuit seeking injunctive and monetary relief under, *inter alia*, 47 U.S.C. § 531(e), N.Y. Pub. Serv. L. § 229(3), and 42 U.S.C. § 1983. 47 U.S.C. § 531(e) provides that

> a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity.

Similarly, New York Public Service Law § 229(3) states that "[n]o cable television company may prohibit or limit any program or class or type of program presented over a leased channel or any channel made available for public access or educational purposes." In his § 1983 cause of action, Goldberg complained that he had been deprived of his federal rights under the Cable Act, but did not assert any infringement of his First Amendment rights. Each cause of action was based on the same contention: that CSC should be required to carry the installments of the "America's Defense Monitor" program *with* the twenty-five second segment offering videotapes and transcripts of the program.

Goldberg moved for a preliminary injunction requiring CSC to cablecast the programs complete with the disputed segments. Because the parties had submitted a stipulation of facts and the court saw no need for further hearings, however, the court considered the case on cross-motions for summary judgment addressing, *inter alia*, the necessity of the issuance of a permanent injunction. *See Goldberg v. Cablevision Sys. Corp.*, 69 F.Supp.2d 398, 399 (E.D.N.Y.1999).

The district court granted summary judgment in favor of CSC on all of Goldberg's claims. *See id.* at 404. The court first concluded that the section CSC had refused to cablecast was "an offer[ ] [by Goldberg] to enter into a commercial transaction with his viewers." *Id.* at 402. It then decided that it was lawful for CSC to prevent commercial programming from appearing on public access channels. *See id.* at 402–04. Goldberg appealed the district court's judgment with respect to his cause of action based on § 531(e) of the Cable Act, challenging both of the conclusions on which that ruling rested.

We vacate the judgment and remand the case to the district court for further proceedings consistent with this opinion.

### DISCUSSION

#### I. Appellate Jurisdiction

Although neither party has raised the issue, we are obliged at the outset to assess whether we have jurisdiction to hear this appeal. *See Natale v. Town of Ridgefield*, 927 F.2d 101, 104 (2d Cir.1991). We conclude that we do.

Goldberg was joined by George Goloff as a plaintiff in this lawsuit. Goloff sought to challenge CSC's refusal to carry a program entirely unrelated to Goldberg, CDI, or "America's Defense Monitor" on the public access channel of another of CSC's Long Island systems because his program too was deemed by CSC to be "commercial." Although the district court granted summary judgment against Goldberg, it did not address Goloff's claims, which remain pending. *See Goldberg,* 69 F.Supp.2d at 399 n. 2, 404. The only order entered in this case therefore did not dispose of all of the claims of all of the parties. It is thus not a "final order" appealable under 28 U.S.C. § 1291.

But prior to the entry of summary judgment, Goldberg made a motion for a preliminary injunction requiring CSC to cablecast the disputed CDI programs in their entirety. Instead of ruling specifically on that motion, the district court considered the cross-motions for summary judgment on the merits. *See id.* at 399. By ruling in favor of CSC on those motions, the court necessarily denied Goldberg's request for a preliminary injunction. Thus, even though the grant of summary judgment to CSC is "interlocutory" because Goloff's claims remain undecided, that ruling is nonetheless appealable under 28 U.S.C. § 1292(a)(1), which provides for appellate jurisdiction over "[i]nterlocutory orders ... refusing injunctions." *See, e.g., Forest City Daly Hous., Inc.,* 175 F.3d 144, 149 & n. 4 (2d Cir.1999); *United States v. Miller,* 14 F.3d 761, 763 (2d Cir. 1994); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992).

## II.   Standard of Review

■ Although we rely upon the district court's denial-in-effect of Goldberg's motion for a preliminary injunction as a basis for appellate jurisdiction, the grant of summary judgment to CSC is the ruling that has been appealed to us. We review such a ruling *de novo,* construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), *cert. denied,* 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   Whether CSC's Refusal to Cablecast Goldberg's Submission with the Disputed Closing Segment Violated 47 U.S.C. § 531(e)

Goldberg contends that the district court erred in ruling in favor of CSC because federal law forbids a cable operator to exercise "editorial control" over any program submitted for cablecasting on a public access channel. This prohibition, Goldberg argues, is subject to a single exception not applicable here: "[A] cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." 47 U.S.C. § 531(e). His appeal thus raises two separate but interrelated questions: The first is whether a cable operator's refusal to cablecast a

program or portion thereof that does not fall within the definition of public access programming constitutes the type of "editorial control" prohibited by the Cable Act. The second is whether, assuming a cable operator may patrol the borders of public access channels in this way, the segment of the program submitted by Goldberg and refused access by CSC in fact fails to qualify as public access programming such that CSC's refusal to cablecast it was lawful.

### A. Whether a Cable Operator May Refuse a Submitted Program that Does Not Qualify as Public Access Programming

We have previously rejected Goldberg's argument that a cable operator is powerless to prevent the use of its PEG access channels by programming that does not belong there. We held in *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir.1997), in the context of educational and governmental access channels (the "E" and "G" of "PEG"), that a cable operator's decision that a program does not qualify for PEG access is not the exercise of "editorial control" prohibited by § 531(e) of the Cable Act. We noted that § 531(e) precludes "the [cable] operator from attempting to determine the content of programming that is *within* the PEG categories," *id.* at 928 (emphasis added), but rejected the notion "that the operator is barred from enforcing" the contractual and state-law provisions pursuant to which PEG access is defined. *Id.* Analogizing to the Postal Service's authority to determine whether a customer's materials are eligible for third class or other reduced rates, we stated that "cable operators may enforce the boundaries of the categories they are obliged to offer . . . without violating section 531(e)." *Id.* at 929.

■ Goldberg seeks to avoid the clear import of *Time Warner* by arguing that CSC may enforce those boundaries only by either enlisting the aid of a court or imploring those who submit material for cablecasting to respect the limits of public access channels. But such a reading would vitiate the authority of cable operators that we recognized in *Time Warner*, and we find nothing either in the reasoning of that case or in the language, history, or structure of the Cable Act to support it. We understand *Time Warner* to hold directly to the contrary that a cable operator may, without seeking the assistance of a court, refuse to cablecast on a public access channel any programming that does not meet the legal criteria for dissemination in that forum.

### B. Whether the Closing Segment of the CDI Program Qualifies for Cablecasting on a Public Access Channel

The question presented, then, is whether the disputed segment of the CDI program submitted by Goldberg qualifies as public access programming. The answer to that question will determine whether, in refusing to air the segment, CSC was permissibly enforcing the boundaries of its public access channel or was instead exercising editorial control in violation of § 531(e). Federal law, which is silent about the definition of PEG programming, does not explicitly answer this question; instead, we must look to New York State law and regulations defining the contours of public access channels and to Congress's stated goals in providing for them to determine whether the segment submitted by Goldberg legally belonged in the PEG category.

1. *The Definition of Public Access.* New York law is clear, if only in a general sense, about what constitutes public access programming. The regulations issued by

the Public Service Commission define a "public access channel" as "a channel designated for *noncommercial* use by the public on a first-come, first-served, nondiscriminatory basis." N.Y. Comp.Codes R. & Regs. tit. 9, § 595.4(a)(1) (emphasis added). The Oyster Bay franchise agreement, which must conform to state law in this regard, *see id.* § 595.4(e)(2), echoes this requirement by providing that CSC's public access channels may be used only for public submissions of "non-commercial programs." [9] Thus, a simple rule emerges when the state law definition of public access is combined with the federal Cable Act as interpreted by this Court: CSC was authorized to reject the CDI segment submitted by Goldberg only if it constituted commercial (i.e., did not constitute "noncommercial") programming.

2. *The Definition of "Noncommercial."* The district court recognized that the disputed segment of the CDI program did not qualify for broadcast on a public access channel unless it was "noncommercial." *See Goldberg,* 69 F.Supp.2d at 403. The court "ha[d] no difficulty" concluding that to the contrary, it was commercial in nature. *Id.* at 402. Noting that in the segment containing the advertisement, "for whatever reason, Goldberg is offering tapes and transcripts of the program for sale," the court concluded that the seg-

ment was "[p]lainly [an] offer[ ] [by Goldberg] to enter into a commercial transaction with his viewers." *Id.* The court then alluded to Supreme Court decisions defining commercial speech for First Amendment purposes, stating that "the . . . segment of the program [in issue] falls within the 'core notion of commercial speech—"speech which does no more than propose a commercial transaction." ' " *Id.* (quoting *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976))). This conclusion was unaffected either by CDI's assertion that the sales of tapes and transcripts produced only a "very small income stream" and helped to disseminate CDI's message, or by the fact that the CDI program that preceded the offer and that was the subject of the sale contained discussions of public issues that were matters of public debate. *Id.*

To be sure, CDI's sale of tapes and transcripts, like any other exchange of goods for money, may be "commercial" for at least some purposes.[10] For example, the offer proposing the sale might be without First Amendment protection if it were false or misleading, *see Cent. Hudson Gas*

---

9. We recognize that the meaning of "noncommercial" in the franchise agreement and "commercial" in Access Rule 3(d) could conceivably differ from the definitions of those terms under State law. Because any contractual narrowing or broadening of those terms would arguably be inconsistent with state law in violation of N.Y. Comp.Codes R. & Regs. tit. 9, § 595.4(e)(2), as well as with other provisions of the agreement itself, however, we read the contractual and statutory definitions to be coterminous and therefore focus on the latter in our analysis.

10. "Commercial" means "[o]f or relating to commerce." *The American Heritage Dictio-*

nary of the English Language 371 (4th ed.2000). Dictionary definitions of "commerce," in turn, speak in terms of "[t]he buying and selling of goods . . .," *id.;* the "[e]xchange between men of the products of nature or art; buying and selling together; trading; exchange of merchandise," *The Oxford English Dictionary,* 552 (1989); and "the exchange or buying and selling of commodities on a large scale involving transportation from place to place," *Merriam–Webster's Collegiate Dictionary,* 230 (10th ed.2000) (second definition). Advertisements for the CDI tapes and transcripts appear to fit the first two definitions if not the third.

& *Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and the rights of the parties to such a sale would likely be governed by the Uniform Commercial Code.[11] In that sense, the offer contained in the CDI advertisements very well may have "propose[d] a commercial transaction." *Virginia State Bd. of Pharmacy,* 425 U.S. at 762, 96 S.Ct. 1817.[12]

But we cannot agree with the district court that speech that "does no more than propose a commercial transaction" and therefore is "commercial speech" for purposes of First Amendment analysis is necessarily "commercial" for purposes of deciding whether it is entitled to first-come, first-served access to free cable channels. An advertisement for tapes and transcripts of a cablecast may be "commercial" for purposes of assessing constitutional limits on regulating the truth of the statements

contained in the advertisement, yet "noncommercial" for access purposes because of the role the advertisement plays in furthering the dissemination of the contents of the program in more permanent form. The meaning of "commercial speech" employed by the district court was developed by the Supreme Court in order to identify a species of speech which, because of its commercial function, is amenable to regulation or prohibition outside of First Amendment restraints when it is false or misleading. *See Virginia State Bd. of Pharmacy,* 425 U.S. at 771–73, 96 S.Ct. 1817;[13] *Cent. Hudson Gas & Elec. Corp.,* 447 U.S. at 566, 100 S.Ct. 2343 ("For commercial speech to come within [First Amendment protection], it at least must concern lawful activity and not be misleading.") To find an appropriate definition of "noncommercial use" in the present context, we must engage in a different inqui-

---

11. *See* U.C.C. § 2–106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price.")

12. To the extent that CDI's advertisements were part of its effort to disseminate its message, they did in a sense do *"more* than propose a commercial transaction." *Virginia State Bd. of Pharmacy,* 425 U.S. at 762, 96 S.Ct. 1817 (emphasis added). They were part of a process by which CDI conveyed facts and expressed opinion. *Cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("The publication here was not a 'commercial' advertisement in the sense in which the word was used in [*Valentine v.*] *Chrestensen* [, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (holding that commercial advertising was then without First Amendment protection)]. It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.") Nevertheless, for purposes of this analysis we assume that CDI's advertisements did "no more than propose a commercial transaction," *Goldberg,* 69 F.Supp.2d at 402, and

were therefore "commercial speech" for purposes of First Amendment analysis.

13. The Court has said that "commonsense differences [between commercial speech and "other forms"] ... suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." *Virginia State Bd. of Pharmacy,* 425 U.S. at 771–72 n. 24, 96 S.Ct. 1817. Among these differences is the fact that "commercial speech ... may be more easily verifiable by its disseminator than ... news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds." *Id.* at 772 n. 24, 96 S.Ct. 1817.

These differences are relevant insofar as they address permissible regulation of the truth of any claims or representations about the products offered in advertisements for tapes and transcripts. But they may be irrelevant to the determination of whether such advertisements must be accepted for cablecast on public access channels.

ry, assessing the customs and policies underlying the preferential treatment of "noncommercial" programming in the public access context. It is to that analysis that we now turn.

■ First, we take notice that it is common practice for educational and ideological programs aired on television and the radio to conclude with an offer of or directions for obtaining a transcript or duplicate tape of the program. As a representative of CDI attested, these offers help a variety of organizations to expand their audience and extend the reach of their message. In light of this practice and the reasons for it, we are unable to agree with CSC that such offers are "clearly" inconsistent with the public access medium.

Second, inclusion of the offer for sale of duplicate tapes or transcripts in the public access forum can further the goals of both Congress and the State of New York in recognizing and providing for PEG channels. Congress has stated that public access programming serves the vital interest of "provid[ing] the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4).

> Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to electronic media with the opportunity to become sources of information in the electronic marketplace of ideas.... [These] channels also contribute to an informed citizenry.

H.R.Rep. No. 98–934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667; *see also* S.Rep. No. 102–92, at 50–53 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1183–86. Congress has also emphasized that a central goal of its regulation of the cable industry generally is to "ensure that there will be free competition of ideas and

voices." S.Rep. No. 102–92, at 50, *reprinted in* 1992 U.S.C.C.A.N. at 1183. Similarly, the New York State Commission on Cable Television, a predecessor agency of the Public Service Commission for these purposes, stated that "[o]ne of the fundamental objectives of cable television access is to contribute to the diversity of information and information sources available to the public and to stimulate public debate by providing a forum therefor." New York State Comm'n on Cable Television, *In the Matter of Minimum Standards for the Designation and Use of Channel Capacity for Public, Educational and Governmental Access, reprinted in* George H. Shapiro, *Franchise Overbuilds, Franchise Fees, and Access Channel Litigation,* 266 PLI/Pat 293, 351 (1989) ("*Minimum Standards* "). By making available to the viewer a more durable version of the program that he or she has just watched, offers of tapes or transcripts can promote these policies by allowing the viewer to further disseminate, study, remember, criticize, discuss, or rebut the message conveyed in the program.

Third, we have cautioned that "courts enforcing the outer limits of PEG categories must be alert not to permit a cable operator to bar disfavored programming under the guise of enforcing such limits." *Time Warner,* 118 F.3d at 928. Although this warning has an obvious meaning with respect to attempts by a cable operator to squelch the dissemination of views that are unpopular or with which the operator disagrees, it also has force where, as here, applicable state law appears to provide a financial incentive for a cable operator to deem a program ineligible for public access cablecasting. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 595.4(c)(12) (providing that under certain circumstances a cable operator may use vacant PEG access space for paid programming). Because a cable

operator has an incentive to exclude as much as possible from its public access channels, we hesitate to provide it with carte blanche in doing so, especially when we have concluded that the disputed programming can further the purposes of the PEG concept.

■ In light of these considerations, we conclude that in this context, whether an advertisement for the sale of tapes and transcripts of a public access program is "commercial" depends on the advertisement's function. If its primary role is to disseminate more broadly or more permanently the message contained in the program, then requiring a cable system to carry it without charge is fully consistent with the purpose of public access channels: "to contribute to the diversity of information and information sources available to the public and to stimulate public debate by providing a forum therefor." *Minimum Standards*, at 351. Cablecasts of such advertisements ultimately help to promote "the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4). They extend the reach of "the video equivalent of the speaker's soap box ..., provid[ing] groups and individuals who generally have not had access to electronic media" with more effective access. H.R.Rep. No. 98–934, at 30, 1984 U.S.C.C.A.N. at 4667.

If the principal function of an advertisement for tapes and transcripts is to produce financial gain, by contrast, requiring cable companies to carry it on their public access channels would do little to advance the goals underlying the creation of those channels. Because there is money to be made, such tapes and transcripts will likely be promoted and purchased, and the mes-sage contained on them therefore propagated, even if the seller must pay for the necessary advertising time. At the same time, requiring cable operators to carry such advertisements on public access channels may threaten the diversity of those channels by opening them to an onslaught of material properly carried in paid media, thereby crowding out legitimate PEG programming that has no other effective avenue of dissemination. "[I]t is precisely because much of PEG programming has a limited, often specialized audience whose needs are not otherwise met that makes it important not to divert PEG channels to non-PEG purposes." *Time Warner*, 118 F.3d at 929–30.

PEG access is provided at no charge, and therefore entirely at the expense of the cable operator. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 595.4(c)(6).[14] We would not lightly conclude that Congress and the New York State Public Service Commission meant to permit purveyors of tapes, transcripts, or indeed other goods to appropriate valuable cable access from a cable company for their own financial benefit without paying for it.

*3. Application of the Definition.* We realize, of course, that this rule may be simpler to state than to apply. Determining the function of an advertisement in this context may be difficult. Several observations are therefore in order.

■ First, the burden of establishing entitlement to cablecast on a public access channel should be placed on the person seeking it. That person will likely be better positioned than the cable company to come forward with proof as to the primary function of the advertising in question. *Cf. United States v. 194 Quaker Farms Rd.,*

---

**14.** "Leased channels" that cable operators are required by federal law to make available to parties unaffiliated with the operator, *see* 47 U.S.C. § 532(b)(1), are, by contrast, typically the subject of a commercial lease be-tween the cable operator and programmer, which lease sets various rates, terms, and conditions for the channel's use. *See, e.g.,* H.R.Rep. No. 98–934, at 48, *reprinted in* 1984 U.S.C.C.A.N. at 4685.

85 F.3d 985, 990 (2d Cir.1996) (placing the burden of proof on the person with superior access to evidence "is a common feature of our law") (citation omitted).

Second, that the principal *purpose* of an advertisement is not financial would indicate that its principal *function* is probably not financial gain. We think that, in most if not all cases, if the program's submitter can show at the time of submission of the program to the cable operator that the price for which the tapes or transcripts are being advertised was calculated by the advertiser to cover only the advertiser's marginal costs for the sale and dissemination of the tapes or transcripts, the advertising would be "noncommercial."

In cases in which the manner in which the price is set is not conclusive, both the nature of the submitter or advertiser and the nature of the program in which the advertisement appears may be considered. If the entity supplying or producing the advertisement is a profit-making organization (assuming that such an organization can ever obtain time on public access channels for its programming), then it is likely that the tapes and transcripts are being offered as part of an overall effort by that entity to make money. A not-for-profit organization's advertisements of this sort are, conversely, less likely to have a financial role, although, as this case illustrates, that fact is not dispositive. And an advertisement for a program devoted to the presentation of information or ideas at the core of the seller's educational or ideological goal is less likely to be part of an effort to obtain a financial benefit than is an offer to sell reproductions of programming that is either devoid of ideas or information, or rich in the kind of content commonly carried on leased access or ordinary news and entertainment channels.

In Goldberg's case, the record evidence as to the function of the CDI adver-

tisements for tapes and transcripts of "Americas Defense Monitor" is inconclusive. CDI's "Director of Television" stated by way of affidavit that the advertisements were "[t]o further disseminate our point of view." At the same time, however, he conceded that the $39 price of videotapes exceeded the cost of providing them. We cannot say whether the principal role of the advertisements was the further dissemination of CDI's views or the generation of a "small income stream" after the sales transactions were completed. Neither CSC at the time it was assessing the advertisements for cablecast nor the district court addressed the issue; Goldberg and CDI treated it only in passing during the course of this litigation. We therefore return the case to the district court to decide the issue in the first instance.

## CONCLUSION

For the foregoing reasons the district court's order granting summary judgment is vacated and the case is remanded for further proceedings consistent with this opinion.