**TRANSPORTATION ALTERNATIVES, INC., Plaintiff,**

v.

**CITY OF NEW YORK and Henry J. Stern, Commissioner of the New York City Department of Parks and Recreation, Defendants.**

No. 01 Civ. 6465(SAS).

United States District Court, S.D. New York.

Aug. 15, 2002.

Christopher Dunn, Arthur Eisenberg, Donna Lieberman, New York Civil Liberties Union, New York City, for Plaintiff.

Dana Biberman, New York City Law Department, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

The New York City Parks Department owns and manages more than 1,700 parks, playgrounds and recreation facilities.[1] These properties range in size from ballfields and swimming pools, at the small end of the spectrum, to flagship parks such as Pelham Bay in the Bronx and Central Park in Manhattan (a total of more than 28,000 acres). Over the course of a year, these properties are used by millions of people for multiple reasons and it is obvious that some regulation is necessary. "A city the size of New York cannot," for example, "allow rallies or demonstrations to take place in city parks at the whim of promoters." *Beal v. Stern,* 184 F.3d 117, 123 (2d Cir.1999).

At the same time, the City may only enact regulations that comply with the First Amendment's guarantee of free speech. Of course, there is no absolute prohibition against regulations that affect activities protected by the First Amendment. Nor do all activities receive the same amount of protection—for example, First Amendment doctrine, as well as commonsense, have always supported a distinction between speech that supports a certain political view (*i.e.,* political speech) and speech urging the purchase of a particular soft drink (*i.e.,* commercial speech).

But the First Amendment does shift the burden to the government to prove that any regulation based on the content of the speech, political or commercial, is constitutional. Regulation of political speech is subjected to the most exacting scrutiny— the government must show that it has a

---

1. *See generally* City of New York/Parks & Recreation, Frequently Asked Questions, http:// nycparks.completeinet.net /sub_faqs/park_ faqs.html.

compelling need to restrict the speech by the regulation it adopts and that it has done so in a narrowly-tailored manner. Regulation of commercial speech is less harsh but still burdensome: The government must articulate the legitimate interest it seeks to promote in passing the regulation and then show that there is a reasonable fit between the legislature's goal and the regulation enacted to accomplish it.

In April 2001, the City of New York promulgated new regulations governing the fees that must be paid to hold events on property managed by the Parks Department. These regulations, codified in Chapter 2 of Title 56 of the Rules of the City of New York ("RCNY" or the "Rules"), allow the Parks Commissioner to charge higher fees to groups that have commercial sponsorship. " 'Commercial sponsorship' exists where a for-profit entity is the permittee, primary host, has contributed to underwriting the cost of an event, or whose trade name, trademark or logo appear in advertising associated with the event.' " 56 RCNY 2–10(a).

A few months after the adoption of these new regulations, the Parks Department informed Transportation Alternatives, a non-profit organization, that it would be required to pay $6,000 in order to hold its annual event in Central Park because the

event had "commercial sponsorship." Transportation Alternatives then sued the City and Henry J. Stern, then-Commissioner of the Parks Department,[2] on the ground that the new regulations violate the First Amendment because "of the excessive nature of the fees." [3] Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.Mem.") at 19. *See also* First Amended Complaint ("Am. Compl.") ¶ 1.

Transportation Alternatives now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the City cross-moves for summary judgment in its favor.[4] For the reasons stated below, Transportation Alternatives's motion is granted and the City's motion is denied.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is

---

**2.** On January 25, 2002, Mayor Michael R. Bloomberg replaced Stern by appointing Adrian Benepe as Parks Commissioner.

**3.** Plaintiff also argues that the regulations "confer excessive discretion on government officials to vary the amount of the fees." Pl. Mem. at 19. Because I find that the Parks Department regulations violate the First Amendment regardless of the amount of discretion conferred on officials in the Parks Department, I do not address this issue, *see infra* Part V.A.

**4.** *See* Plaintiff's Notice of Motion for Summary Judgment ("Pl.Notice"); Defendants'

Notice of Cross–Motion for Summary Judgment ("Def.Notice"); *see also* Pl. Mem. at 19–25; Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Pl.Reply.") at 6–9; Defendants' Memorandum of Law in Support of Cross–Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Mem.") at 11–23; Defendants' Memorandum of Law in Reply to Plaintiff's Opposition to Defendants' Cross–Motion for Summary Judgment ("Reply Mem.") at 3–10.

'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Hous. Auth. of City of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (internal quotations and citations omitted).

"In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. General Elec. Co.,* 242 F.3d 78, 83 (2d Cir.2001). Thus, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [5] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. GENERAL FRAMEWORK OF THE FIRST AMENDMENT

### A. Non–Commercial Speech

 The First Amendment commands that the government "shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." [6] U.S. Const. amend. I. While "the prohibition on encroachment of First Amendment protections is not an absolute," *Elrod v. Burns,* 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the plain language of the First Amendment reflects a profound mistrust of the government. "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coalition,* —— U.S. ——, ——, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002).

 Thus, when the government seeks to regulate speech based on its content, it must overcome a presumption of unconstitutionality. For example, "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Likewise, "government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

 Once it is determined that government regulation is content-based, courts apply strict scrutiny in determining whether that regulation is constitutional. Under this test, the government has the burden of proving that the speech restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White,* —— U.S. ——, ——, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002).[7]

**5.** The facts of the case are largely undisputed. Plaintiff's Local Civil Rule 56.1 Statement ("Pl.56.1") contains 149 paragraphs of factual contentions of which defendants only dispute the facts stated in four. *See* Defendants' Response to Plaintiff's Local Rule 56.1 Statement (disputing statements made in paragraphs 38, 39, 40 and 98). Similarly, Defendants' Amended Local Civil Rule 56.1 Statement ("Def.56.1.") contains 49 factual contentions of which all but four are uncontested. *See* Plaintiff's Response to Defendants' Local Rule 56.1 Statement (disputing statements made in paragraphs 10, 16, 17 and 44). These factual disputes do not pre-

clude resolution of the summary judgment motion. *See* Def. Reply at 1 ("[B]oth parties agree that no dispute as to material facts exists which would make summary judgment inappropriate in this matter.") (citations omitted).

**6.** The First Amendment applies to the states and their municipalities through the Fourteenth Amendment. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (citations omitted).

**7.** *See also Simon & Schuster,* 502 U.S. at 118, 112 S.Ct. 501 ("The [challenged] law estab-

## B. Commercial Speech

■ Over "[a] quarter of a century ago, the [Supreme] Court held that commercial speech, usually defined as speech that does no more than propose a commercial transaction, is protected by the First Amendment." *United States v. United Foods, Inc.*, 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). The Supreme Court's "decisions, however, have recognized the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) (quotation marks and citation omitted). "The Constitution therefore affords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id. See also Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 64–65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (same).

■ When reviewing the constitutionality of a government restriction on speech that is commercial in nature, the Supreme Court has repeatedly used the four-part test established by *Central Hudson Gas & Elec. Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[8] In *Central Hudson*, the Court held:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. 2343. Thus, "[e]ven under the First Amendment's somewhat more forgiving standards for restrictions on commercial speech, a State may not curb protected expression without advancing a substantial governmental interest." *Edenfield v. Fane*, 507 U.S. 761, 777, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

lishes a financial disincentive to create or publish works with a particular content. In order to justify such differential treatment, 'the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' ") (quoting *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)).

**8.** *See, e.g., Thompson v. Western States Med. Ctr.*, —— U.S. ——, ——–——, 122 S.Ct. 1497, 1503–04, 152 L.Ed.2d 563 (2002) (applying *Central Hudson*); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184–196, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (citing cases applying *Central Hudson*); *see also Anderson v. Tread-well*, 294 F.3d 453, 460 (2d Cir.2002) ("Although some members of the Supreme Court have questioned whether the *Central Hudson* analysis should be applied in particular commercial speech cases, the Court has rejected the argument that strict scrutiny should apply to regulations of commercial speech that are content-specific, adhering instead to the somewhat less rigorous standards of *Central Hudson*."); *Long Island Bd. of Realtors, Inc. v. Incorporated Vill. of Massapequa Park*, 277 F.3d 622, 626 (2d Cir.2002) (stating that the Supreme Court's decision in *Lorillard* affirms "that *Central Hudson* provides the basis for considering the constitutionality of regulation of commercial speech").

For a list of commercial speech cases decided by the Supreme Court after *Central Hudson*, see David A. Anderson, "Freedom of the Press," 80 *Tex. L.Rev.* 429, 480 n. 275 (2002).

## III. TRANSPORTATION ALTERNATIVES AND THE NYC CENTURY BIKE TOUR

### A. Transportation Alternatives

Founded in 1973, Transportation Alternatives is a not-for-profit organization that seeks to promote bicycling and walking, and reduce automobile use in New York City. *See* Pl. 56.1 ¶¶ 1–2. With over 5,000 members, and seven full-time employees, Transportation Alternatives is currently the nation's leading regional advocate for cycling. *See id.* ¶ 1. Over the last three decades, the organization sought and achieved numerous improvements for bicyclists, pedestrians and mass-transit commuters. *See id.* ¶ 3. For example, the group was instrumental in securing a bike lane on Second Avenue and winning legal bike access on New York City subways and commuter railroads.[9] *Id.*

Transportation Alternatives has several advocacy initiatives that include promoting the "Car–Free Central Park Campaign" and attempting to collect 100,000 signatures for a petition to present to Mayor Bloomberg.[10] *See id.* ¶ 4. Transportation Alternatives also directly engages government officials and agencies through daily letters, phone calls, meetings and electronic communications. *See id.* ¶ 7. The group also joins advocacy efforts initiated by other civic groups, such as the Straphangers Campaign (a New York transit riders advocacy group), and occasionally creates advocacy coalitions.[11] *See id.* ¶ 5.

Transportation Alternatives devotes a large portion of its resources to educating the general public about safety issues surrounding cycling, walking and other transportation in New York City. *See id.* ¶ 6. For example, from 1997 to 2001 Transportation Alternatives ran the Bronx Safe Routes to School program, reaching out to local community organizations to educate parents at thirty-eight schools (a total of 335,420 students) about child pedestrian safety issues. *See id.* ¶ 6.

Transportation Alternatives also publishes two quarterly magazines—*Transportation Alternatives* and *City Cyclist*—that are distributed to thousands of New Yorkers, including 500 government officials. *See id.* ¶ 8. An e-bulletin service is sent to over 9,000 subscribers. *See id.* Finally, the group has an extensive website (www.transitalt.org) that was visited

9. "Some of Transportation Alternatives's recent accomplishments include: secured a promise from the New York City Department of Transportation for a full-time dedicated bike path on the Queensboro Bridge; won passage of a landmark statewide traffic calming law; ended the delays on the Williamsburg Bridge South bike path; won a commitment to extend the Hudson River Greenway; reversed the Riverbank Bicycle Ban; secured the 2nd Avenue Bike Lane; eliminated the bike permit requirement on PATH trains; got bike racks installed on city streets; secured bike lanes on Cross Bay Blvd, 34th Avenue, Hudson St, Bedford Avenue; got speed humps installed on neighborhood streets; won longer car-free hours in Central Park and Prospect Park; won a ramped bike path on the Brooklyn Bridge instead of dangerous stairways; won full-time access to the George Washington Bridge; secured safe bike parking at several midtown garages; won legal bike access on New York City subways and commuter railroads; secured pedestrian and cyclist access to River Road on the Jersey Palisades; and overturned the midtown bicycle ban." Pl. 56.1 ¶ 3.

10. Although Transportation Alternatives often works with the Parks Department, its Car–Free Park campaign has become a contentious issue with the Department because of extensive public support of this direct advocacy effort. *See* Pl. 56.1 ¶ 12.

11. For example, in 1994, Transportation Alternatives created a city-wide coalition of more than 100 block associations, civic groups, and business groups working for quieter, safer, friendlier neighborhood streets. *See* Pl. 56.1 ¶ 5.

by approximately 400,000 persons in the last year. *See id.*

## B. NYC Century Bike Tour

Since 1990, Transportation Alternatives has sponsored the NYC Century Bike Tour, an event at which participants can ride up to 100 miles around New York City. *See id.* ¶ 13. The event seeks to increase the public's awareness of the organization and its goals, encourage participants to support Transportation Alternatives, raise funds for the group, and solicit members. *See id.* ¶ 14. To promote the event, Transportation Alternatives distributes brochures about the ride and about the group to 100,000 people. *See id.* ¶¶ 13–14.

Participants in the NYC Century Bike Tour gather early in the morning near Harlem Meer, an irregularly-shaped body of water that covers the northeast corner of Central Park. *See id.* ¶ 15.[12] The participants then ride through New York City on routes established by Transportation Alternatives. *See id.* Many participants have messages on their clothing or bicycles expressing support for Transportation Alternatives and its advocacy. *See id.* For instance, many participants wear shirts with the slogan "One Less Car." *See id.*

Transportation Alternatives uses the NYC Century Bike Tour to prompt participants to engage in direct political advocacy. *See id.* ¶ 16. For example, at a rest stop used for the September 2001 event, Transportation Alternatives obtained the signatures of 2,000 participants on a petition calling for a car-free Central Park and collected 200 additional signatures at the Central Park site. *See id.* Likewise, at the September 2000 event, Transportation Alternatives distributed postcards that advocated positions on various issues, which were then sent to government agencies and officials. *See id.*

At the end of the Bike Tour, many participants return to the original assembly area in Central Park, where Transportation Alternatives sets up a table and provides literature about its organization. *See id.* ¶ 17. Since at least 1999, Transportation Alternatives has had signs and banners at Central Park promoting the organization and its work. *See id.*

Individuals can ride in the NYC Century Bike Tour without charge or restriction. *See id.* ¶ 20. Any member of the public may ride with the group by assembling at a starting point in Central Park and anyone may assemble at the northern end of Central Park at the conclusion of the ride. *See id.*

Transportation Alternatives, however, prefers that people register for the event and pay a fee. *See id.* ¶ 21. Registration fees vary depending upon whether the person is a member of the group and how far in advance the person registers for the event. *See id.* For the September 2001 NYC Century Bike Tour, the registration fees ranged from $30 to $50. *See id.*

All of the proceeds from the NYC Century Bike Tour are used to support the work of Transportation Alternatives, and the Bike Tour is the group's single largest fundraising event. *See id.* ¶ 22. The registration form for the NYC Century Bike Tour explicitly states that the registration fees for the event go to support the advocacy work of Transportation Alternatives. *See id.* ¶ 23.

Since at least 1999, those who register for the Bike Tour have received a Transportation Alternatives t-shirt and an official race bib to pin to the shirt. *See id.* ¶ 24. In addition, participants have re-

---

12. *See also* The New York City Century Bike Tour 2002, http://www.transalt.org/calendar/century/index.html.

ceived items such as water bottles and food items donated by for-profit entities (*e.g.,* Clif Bar, a type of sports bar), which are distributed by Transportation Alternatives staff and volunteers. *See id.* Any person—officially registered or not—who returns to Central Park after the ride may receive a free cup of Ben & Jerry's ice cream, which is dispensed from a Ben & Jerry's truck parked on a paved area in Central Park near the northern boundary of the park. *See id.* ¶ 25. The ice cream is not for sale. *See id.* Ben & Jerry's provides the ice cream in part to express its support for the advocacy work of Transportation Alternatives.[13] *See id.*

Other for-profit entities have also served as sponsors of the NYC Century Bike Tour by providing Transportation Alternatives with financial assistance to offset costs incurred by the event or donating goods or services to be used at the event (such as energy bars and fruit) or both. *See id.* ¶ 27. Transportation Alternatives has acknowledged this support in printed materials associated with the event and on its website, identifying the sponsors by name and reproducing logos associated with the sponsors.[14] *See id.*

### C. The Instant Lawsuit

On July 11, 2001, Transportation Alternatives received a letter from the Parks Department stating that it would be charged $6,000 for a permit for the 2001 event. *See id.* ¶ 110; *see also infra* Part VII.A. (quoting 7/11/01 Letter from Erica Messing, Marketing and Special Events). The letter further explained: "If you [, Transportation Alternatives,] remove the corporate elements of your event, specifically the Ben and Jerry's presence and the Clif Bar sampling, and make the entrance fee simply a suggested donation, on all your literature including your website, then you will only be required to pay the permit application fee of $25.00 and post the appropriate insurance and bond." Pl. 56.1 ¶ 110.

One week later, the group filed this lawsuit challenging, on First Amendment grounds, the Department's fee-setting policies and procedures under section 2–10 and their application to the organization's September 2001 event. At that time, Transportation Alternatives sought declaratory and injunctive relief as well as damages equal to the $6,000 permit fee. The parties then conducted discovery, which included discovery by plaintiff into the Parks Department's fee-setting practices prior to promulgation of the new April 2001 regulations. On the basis of that discovery, the plaintiff filed an Amended Complaint on February 12, 2002, adding allegations concerning the pre-April 2001 policies and practices and seeking damages for the fees imposed for the NYC Century Bike Tour held in September 2000 ($6,000) and September 1999 ($5,500).[15] *See id.* ¶¶ 55, 57, 58, 60.

Transportation Alternatives now seeks a judgment declaring that section 2–10 violates the First Amendment. The group also seeks a permanent injunction against further enforcement of the City's policies and practices with respect to commercial sponsorship. Finally, Transportation Alternatives seeks damages in the amount of $17,500 (which is the sum of the fees

---

13. In addition, the Ben & Jerry's Foundation awarded Transportation Alternatives cash grants in 1994 and 2000 to support the work of the group. *See* Pl. 56.1 ¶ 25.

14. No goods are available for purchase at the NYC Century Bike Tour site in Central Park and the only persons staffing the event at Central Park have been Transportation Alternatives members and volunteers. *See* Pl. 56.1 ¶ 27.

15. The complaint also seeks an award of attorneys' fees and any other relief this Court deems appropriate. *See* Am. Compl. ¶ 33.

charged for the Bike Tours held in 2001, 2000, and 1999).

## IV. CURRENT PARKS DEPARTMENT REGULATIONS

### A. Regulatory Structure of Section 2–10

Before a "demonstration" or "special event" is held in a New York City park, the sponsor must obtain a permit from the Parks Department. *See* 56 RCNY § 1–05(a)(1).[16] The Parks Department regulations define a "demonstration" as more than twenty people engaged in a "meeting, assembly, protest, rally, march or vigil which *involves the expression of views or grievances."* 56 RCNY § 1–02 (emphasis added). In contrast, a "special event" merely involves a group activity with more than twenty people and may include "a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic activity."[17] *Id.*

On April 20, 2001, the Parks Department amended the Rules "by adding a new section 2–10 relating to special events concessions." 4/20/01 Notice of Adoption of 56 RCNY § 2–10 ("Section 2–10 Adoption Notice"), Ex. B to Def. Notice. Under section 2–10, "a special event concession [is required] from the Department in addition to the permit required by § 1–05(a)(1) of this title." 56 RCNY § 2–10(b). This regulatory scheme categorizes special events according to two characteristics: (1) whether the event is "public" or "private" and (2) whether the event has a "commercial sponsor" or not. *Id.* Thus, there are four types of special events:

(1) private events without commercial sponsorship;

(2) private events with commercial sponsorship;

(3) public events without commercial sponsorship; and

(4) public events with commercial sponsorship.

*Id.*

There are a few exceptions to the rules governing special events under section 2–10. It does not apply to public concerts that have "commercial sponsorship with anticipated attendance of more than 10,000 persons." 56 RCNY § 2–10(d). Nor does it apply if a person or group has a license agreement with the City that grants the license holder "the right to schedule events on such parkland."[18] *Id.*

---

**16.** 56 RCNY § 1–05(a)(1) states: "No person shall hold or sponsor any special event or demonstration without a permit."

**17.** Section 1–02 defines various terms that are used in the Rules. It states in pertinent part:

"Demonstration" means a group activity including but not limited to, a meeting, assembly, protest, rally, march or vigil which involves the expression of views or grievances, involving more than 20 people.

 \* \* \* \* \* \*

"Special Event" means a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving more than 20 people or a group activity involving less than 20 people for which specific space is requested to be

reserved. Special Event shall not include casual park use by visitors or tourists.

56 RCNY § 1–02.

**18.** The subsection that exempts certain events from section 2–10 states:

This section shall not apply to (i) public concerts, films or other similar entertainment events with commercial sponsorship with anticipated attendance of more than 10,000 persons, or (ii) events held on parkland subject to a license agreement between the Department or the City and an entity where such license agreement grants to such entity the right to schedule events on such parkland.

56 RCNY § 2–10(d).

In addition, although section 2–10 only applies to "special events," the regulation explicitly states that "[t]his section shall not

Under this regulatory scheme, the "Commissioner [of the Parks Department] may charge an applicant subject to these provisions an amount not more than the amount set forth in" a schedule laid out in the Rules. That schedule is as follows:

| Type of Event/Sponsor (Maximum Amount) | Community Park | Regional Park | Central Park | Facility |
|---|---|---|---|---|
| Private Event w/o Comm'l Sponsor (b)(1) | $25,000 | $ 37,500 | $ 50,000 | $ 50,000 |
| Private Event w/ Comm'l Sponsor (b)(2) | $65,000 | $100,000 | $125,000 | $125,000 |
| Public Event without Comm'l Sponsor (b)(3) | $10,000 | $ 20,000 | $ 25,000 | $ 25,000 |
| Public Event with Comm'l Sponsor | $50,000 | $ 75,000 | $100,000 | $100,000 |

---

56 RCNY § 2–10(f).[19] The fees under this schedule are charged in addition to the other fees required by the Rules such as the $25 processing fee, "clean-up bonds, restoration bonds, and security bonds," or "fees for services (such as rental of a stage or cost of an electrician) provided by the Parks Department in conjunction with such events." Pl. 56.1 ¶ 112. *See also* 56 RCNY § 2–10(f).[20]

Finally, the Rules require the Parks Department to take into consideration the following factors when deciding how much to charge for a permit:

(1) the length of time, time of day and the time of year of the event;

(2) the nature of the use;

(3) the number of persons expected to attend the event;

(4) whether the applicant will impose an admission charge;

(5) the size and type of the proposed venue;

(6) the types and extent of public resources required to stage the event;

(7) the potential for damage to the park or disruption of other park activity;

apply to demonstrations, as defined by § 1–02 of this title." 56 RCNY § 2–10(c).

**19.** Section 2–10 also provides the following definitions: " 'Community park' shall mean any park other than Central Park or a regional park." 56 RCNY 2–10(a). " 'Regional park' shall mean a stadium, golf course or ice skating rink under the Department's jurisdiction, as well as the following parks: Riverside Park, Duffy Square, Randall's Island, Ward's Island, Battery Park, Pelham Bay Park, Van Cortlandt Park, Prospect Park, Flushing Meadows–Corona Park, City Hall Park, Washington Square Park, Union Square Park and Madison Square Park." *Id.* " 'Facility' shall mean a building or structure located within property under the jurisdiction of the Department as specified by the Commissioner." *Id.*

**20.** The full text of section 2–10(f) reads:

The Commissioner may charge an applicant subject to these provisions an amount not more than the amount set forth in this schedule for events of four days or less in duration (including any set up and/or take down periods). For events of more than four days' duration, an additional amount of up to 25% of the indicated amount shall be charged for each day (including any set up and/or take down periods) in excess of four days. The concession amount set forth herein shall be charged in addition to any bonding requirement imposed by the Commissioner pursuant to § 1–03(b)(4) of this title, in addition to the fee imposed by § 2–09(a) of this title, and in addition to any other amount or fee imposed by any other City agency or agencies.

56 RCNY § 2–10(f).

(8) whether the event is a charitable event;

(9) whether the event is held for the purpose of raising funds;

(10) the amount and nature of advertising, including whether the event has title sponsorship; and

(11) such other information as the Commissioner shall deem relevant.

56 RCNY § 2–10(g).

## B. Purpose of Section 2–10

According to section 2–10's Statement of Basis and Purpose, the Parks Department enacted the concession schedule because "[c]ertain types of special events substantially increase traffic and usage of various park venues and require a disproportionate deployment of public resources." Section 2–10 Adoption Notice. "The proper regulation of such events is essential to ensure the protection of parks property and continued enjoyment by the people of public parks." *Id.* Thus, the intent of section 2–10 is "to assure the safety of parks property and the continued public usage of parks property for recreational purposes, to preserve public resources associated with the maintenance and upkeep of parks property" and to inform people about the fees that may be charged for holding special events at a city park.[21] *Id.*

## C. Application Process

The parties agree on the process for obtaining a Parks Department permit. The group seeking a permit files an application at one of the Parks Department offices that are located in each of the five boroughs. *See* Def. Mem. at 6. "If the proposed event is an activity normally handled by the Special Events office, such as a small party or a demonstration, then the Special Events office processes the request and issues a permit for the event at an appropriate and available venue for a fee of $25.00." *Id.*

"If the proposed event is of the type defined in 56 RCNY § 2–10, then the Special Events office forwards the request to the Parks Department marketing office for processing."[22] *Id.* (citation omitted). *See also* Pl. 56.1 ¶ 107. "A member of that office then obtains information about the planned event and drafts a memorandum that included information about the event and usually recommended a fee for the event." Pl. 56.1 ¶ 107 (citing Deposition of Eric Peterson, Director of Special Events and Permits (Manhattan) for the Parks Department ("Peterson Dep.") at 176–77).

---

**21.** The "Statement of Basis and Purpose" reads:

This rule is promulgated pursuant to the authority of the Commissioner of the Department of Parks and Recreation (the "Commissioner") under §§ 389, 533(a)(9), 1043 of the New York City Charter. The Commissioner is authorized to establish and enforce rules for the use, government [sic] and protection of public parks and of all property under the charge or control of the Department of Parks and Recreation. Certain types of special events substantially increase traffic and usage of various park venues and require a disproportionate deployment of public resources. The proper regulation of such events is essential to ensure the protection of parks property and the continued enjoyment by the people of public parks.

These procedures are intended to provide a framework for the Department of Parks and Recreation to assure the safety of parks property and the continued public usage of parks property for recreational purposes, to preserve public resources associated with the maintenance and upkeep of parks property and to inform persons who wish to use the parks for special events of the amounts that may be charged for such events.

Section 2–10 Adoption Notice.

**22.** While the City states that "small parties" are not handled by the marketing department, these are nonetheless events that fall within the scope of section 2–10.

"The memorandum then is presented to the Commissioner, who makes a final decision about the [concession] fee to be charged. Once the fee is set, the Parks Department prepares a contract for signature by the group holding the event." *Id.* *See also* Def. Mem. at 6 (citing Peterson Dep. at 29–32).

## V. FIRST AMENDMENT ANALYSIS OF CURRENT PARKS DEPARTMENT REGULATIONS

Section 2–10 creates a regulatory scheme under which the City may, and usually does, require groups with "commercial sponsorship" to pay more money to hold an event ·on Parks Department property than groups without such sponsorship by imposing a "special events concession" on the former.[23] For example, Transportation Alternatives was charged $6,000 "based, *inter alia,* on the corporate sponsorship of [its] event including an on-site presence in Central Park and the entrance fee that [it] charge[d]." Pl. 56.1 ¶ 110. Had Transportation Alternatives "remove[d] the corporate elements of [its] event, specifically the Ben and Jerry's presence and the Clif Bar sampling, and [made] the entrance fee simply a suggested donation, on all [its] literature including your website, then [it would] only be required to pay the permit application fee of $25.00 and post the appropriate insurance and bond." *Id.*

A close inspection of the Rules shows that the Parks Department imposes financial burdens on two forms of commercial sponsorship. *First,* groups are deemed to have commercial sponsorship when the "trade name, trademark or logo [of a for-profit group] appear in advertising associated with the event." 56 RCNY § 2–10(b). *Second,* commercial sponsorship "exists where a for-profit entity is the permittee,

primary host, has contributed to underwriting the cost of an event" regardless of whether its name is mentioned in connection with the event. *Id.* I will discuss the constitutionality of these two restrictions in turn.

### A. Analysis of Increasing Fees for Use of Trademarks, Trade Names of Logos of For–Profit Companies

### 1. Determining Whether the Marks of For–Profit Companies Constitute Commercial Speech

"Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech," *Bolger,* 463 U.S. at 65, 103 S.Ct. 2875, a threshold question is whether a company's trademark, trade name, or logo when used to show financial support of Transportation Alternatives qualifies as commercial speech. The Supreme Court has defined "the core notion of commercial speech" as "speech that does no more than propose a commercial transaction." *Id.* at 66, 103 S.Ct. 2875 (citations and internal quotation marks omitted). "Outside this so-called 'core' lie various forms of speech that combine commercial and noncommercial elements." *Bad Frog Brewery, Inc. v. New York State Liquor Auth.,* 134 F.3d 87, 97 (2d Cir. 1998). *See also Anderson,* 294 F.3d at 460. "Whether a communication combining those elements is to be treated as commercial speech depends on factors such as [1] whether the communication is an advertisement, [2] whether the communication makes reference to a specific product, and [3] whether the speaker has an economic motivation for the communication." *Bad Frog Brewery,* 134 F.3d at

---

**23.** For a list of events for which the Parks Department has charged fees in excess of $25.00 under section 2–10, see Appendix B (quoting Pl. 56.1 ¶ 113).

97 (citing *Bolger*, 463 U.S. at 66, 103 S.Ct. 2875) (emphasis removed).[24]

 While the use of a company's trademarks, trade names or logos to show financial or material support of a public event "cannot be characterized merely as proposals to engage in commercial transactions," a consideration of the three factors outlined in *Bolger* show that such use constitutes commercial speech. *Bolger*, 463 U.S. at 66, 103 S.Ct. 2875. *First*, the companies' marks, as they are used in plaintiff's pamphlets and website, are advertisements—Transportation Alternatives is advertising the fact that those companies are providing financial or material support for the NYC Century Bike Tour. *Second*, Transportation Alternatives's advertisements make reference to specific products or companies by using these marks. *Third*, Transportation Alternatives has an economic motivation for the communication: The marks are put on the website in return for grants, donations or other forms of material support (*e.g.*, free ice cream or energy bars). "The combination of *all* these characteristics ... provides strong support" for finding that Transportation Alternatives's advertise-

ments are commercial speech.[25] *Id.* at 67, 103 S.Ct. 2875 (emphasis in original). *See also Anderson*, 294 F.3d at 460.

The conclusion that a corporation's marks are commercial speech even when used in connection with an event that is fully protected by the First Amendment is further supported by the Supreme Court's decision in *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 539, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). There, the Supreme Court considered the constitutionality of a federal statute granting the United States Olympic Committee the right to enjoin others from using the trademark "Olympic" in a case where activists were calling an athletic event the "Gay Olympic Games." *See id.* at 535, 107 S.Ct. 2971. The activists claimed that "Olympic" was being used in an expressive manner for a political event and any restriction on it must be subjected to strict scrutiny. *See id.*

The Supreme Court held, however, that "[t]o the extent that [the statute] applies to uses [of 'Olympic'] for the purpose of trade [or] to induce the sale of any goods or services its application is to commercial

---

**24.** *See also Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir.2001) ("In *Bolger*, the Court recognized three factors that help determine whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech."); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir.1999); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 933–35 (3d Cir.1990) (same); *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 524–25 (S.D.N.Y.2001) (same).

**25.** Here, as in *Procter & Gamble*, the third factor is determinative. *See* 242 F.3d at 552 ("Here we consider the *Bolger* factors in reverse order and conclude that the third—the motivation of the speaker—is determina-

tive."). If the corporations' marks were not used in return for financial or material support—for example, if Transportation Alternatives was merely listing those corporations that publicly support its policy initiatives—that use would constitute non-commercial speech, thus requiring a higher level of First Amendment protection. *Cf. Goldberg v. Cablevision Sys. Corp.*, 261 F.3d 318, 329 (2d Cir.2001) (holding that "whether an advertisement for the sale of tapes and transcripts of a public access program is 'commercial' depends on the advertisement's function."). The Parks Department regulations draw no distinction between these two situations. *See* 56 RCNY § 2–10(b) (Commercial sponsorship exists when the "trade name, trademark or logo [of a for-profit group] *appear* in advertising associated with the event." (emphasis added)).

speech." *Id.* (quotation marks and citation omitted). To the degree that "prohibiting the use of one word for particular purposes" infringed on expressive speech, the restriction was "incidental." *Id.* at 536, 107 S.Ct. 2971. The key point with respect to this case is that the Supreme Court evaluated the restriction on the use of the trademark as commercial speech even when used in connection with a political event, rather than as a restriction on non-commercial speech that would deserve strict scrutiny review. *Cf. Friedman v. Rogers,* 440 U.S. 1, 12, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (evaluating ban on use of trade names in optometrical practice under commercial speech doctrine and stating that a trade name is "a form of commercial speech that has no intrinsic meaning").

Finally, common sense—the touchstone of the commercial speech doctrine, *see, e.g., Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343; *Anderson,* 294 F.3d at 460—dictates that the use of a company's mark should not receive the highest level of protection afforded by the First Amendment. For example, the government may prohibit people from carrying signs or distributing handbills that only advertise a company's logo or trademark in a public park. *See, e.g., Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 511, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (upholding constitutionality of ban on signs advertising goods not available on the property where the sign is located). Of course, such a ban is content-based—its application turns on the words expressed (*e.g.,* "Coca–Cola"). But prohibiting such commercial speech can be directly related to substantial government objectives such as aesthetics and traffic safety. *See id.*[26]

Giving trademarks, trade names, or logos the level of protection afforded to non-commercial speech would create disaster for our public parks. The government would have to prove that restrictions placed on the display of those marks were narrowly tailored to promote a compelling government interest. Because "a municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling," *Whitton v. City of Gladstone,* 54 F.3d 1400, 1408 (8th Cir.1995), most bans and regulations on these forms of speech in our parks would be unconstitutional. In other words, once a test of strict scrutiny applies to such speech, then just as the government may not completely ban people from carrying signs or distributing leaflets with political messages in a city park, *see Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), it may no longer ban Coca–Cola from propagating its message of "Drink Coca–Cola" or "Coke is it."[27]

---

**26.** *See also Long Island Bd. of Realtors,* 277 F.3d at 622 (upholding constitutionality of ordinances that regulate residential signs in various ways, including prohibition of off-site commercial advertisement, because "such regulations directly advance the Village's interest in aesthetics and safety") (citing *Metromedia,* 453 U.S. at 508–12, 101 S.Ct. 2882). For other cases in which courts have held that regulations and bans on commercial speech were constitutional because they directly advanced the government's interest in aesthetics or safety, or both, see *Jim Gall Auctioneers, Inc. v. City of Coral Gables,* 210 F.3d 1331, 1333 (11th Cir.2000); *Lavey v. City of Two Rivers,* 171 F.3d 1110, 1113 (7th Cir. 1999); *Southlake Property Assocs. v. City of Morrow,* 112 F.3d 1114, 1116 (11th Cir.1997); *Gold Coast Publ'ns, Inc. v. Corrigan,* 42 F.3d 1336, 1346–48 (11th Cir.1994); *South–Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868, 896–97 (7th Cir. 1991).

**27.** In the alternative, the protection afforded non-commercial speech could be lowered, but this result is even less palatable. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) ("To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guaran-

While in recent years some have questioned the distinction between commercial and non-commercial speech,[28] nowhere does it make more sense than when applied to our public parks. Our democracy requires that in our public parks "citizens must tolerate insulting, and even outrageous, [political] speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos*, 485 U.S. at 322, 108 S.Ct. 1157 (quotation marks and citation omitted). But nothing in our First Amendment jurisprudence demands that we also turn our parks into commercial fora filled with trademarks and logos.[29]

## 2. Constitutionality Under *Central Hudson*

Because section 2–10 imposes a financial burden on commercial speech, the *Central Hudson* test must be applied to determine its constitutionality. *See supra* Part II.B. The first two questions posed by *Central Hudson* are answered easily: *First*, the companies' trademarks, trade names and logos are protected by the First Amendment as they are truthful and concern lawful activities. *Second*, the government has a substantial interest in this regulation of speech as section 2–10 was passed in order to "preserve public resources associated with the maintenance and upkeep of parks property." Section 2–10 Adoption Notice. *See also* Def. Mem. at 14.

The third question raised by *Central Hudson* is whether imposing a financial burden on groups that advertise their financial supporters *directly advances* the asserted interest—and it is here that the City fails to meet its burden.[30] The City argues that "the preservation and maintenance of the City's parks is essential to allow the full use and enjoyment of these scarce public resources by the City's residents and visitors," Def. Mem. at 14, but it fails to explain how this interest is directly advanced by imposing a financial burden on the groups that have commercial sponsorship.

Charging higher fees to groups who advertise the trademark, trade names or logos of their commercial sponsors merely deters those groups from seeking such sponsors—it does not reduce the harm that those groups may (or may not) cause when they hold events on Parks Department property. The inadequacy of section 2–10 in preventing groups from harming Central Park is made evident by the Parks

tee with respect to the latter kind of speech.").

28. *See, e.g., Thompson*, — U.S. at —, 122 S.Ct. at 1504 (noting that "several Members of the Court have expressed doubts about the *Central Hudson* analysis and whether it should apply in particular cases") (citations omitted); *Greater New Orleans*, 527 U.S. at 184, 119 S.Ct. 1923 (citing the work of "certain judges, scholars, and *amici curiae* [who] have advocated repudiation of the Central Hudson standard and implementation of a more straightforward and stringent test for assessing the validity of governmental restrictions on commercial speech").

29. Indeed, given the economic incentives that companies have to advertise themselves, commercial messages might well dominate non-commercial messages if both were given equal access to public parks. *See, e.g., Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 793, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (noting that "among the 1,207 signs removed from public property during [one] week" by the City of Los Angeles, most of the signs "were apparently commercial in character").

30. "It is well established that '[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it.' " *Edenfield*, 507 U.S. at 770, 113 S.Ct. 1792 (quoting *Bolger*, 463 U.S. at 71, n. 20, 103 S.Ct. 2875).

Department approach to Transportation Alternatives. In order to avoid paying the $6,000 concession fee, Transportation Alternatives need not change the number of people who attend its event or take any steps to reduce the harm the event will impose on the park—it need only remove any "corporate elements" from the event. The fact that two events of equal size, that cause equal harm to Parks Department property, are required to pay completely different fees depending on whether there is commercial sponsorship is irrational when measured against the asserted justification for the regulation. Indeed, given the government's asserted justification for enacting section 2–10, it is unreasonable to require Transportation Alternatives to pay anything more than the $25 permit fee.

■■■ With respect to the fourth and final question raised under *Central Hudson*, the City again fails to meet its burden. While regulations on commercial speech must not be "more extensive than is necessary to serve [the asserted] interest," *Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343, Transportation Alternatives would have to "remove the corporate elements of [its] event . . . on *all* [of its] literature including [its] website" in order to qualify for a $25 permit.[31] Pl. 56.1 ¶ 110 (quoting 7/11/01 Letter from Erica Mess-

ing, Marketing and Special Events) (emphasis added). Thus, as interpreted by the Parks Department, section 2–10 sweeps into its scope:

> *Transportation Alternatives*, a 28–page magazine that is published quarterly and is mailed to over 6,000 people, including Transportation Alternatives members and 500 government decision makers;
>
> *City Cyclist*, Transportation Alternatives's 12–page condensed version of *Transportation Alternatives*, which promotes cycling safety and is distributed to approximately 12,000 readers through 92 bike shops in New York City;
>
> Transportation Alternatives's bi-monthly e-bulletin, which began in June 2001 and provides updates and news flashes to over 9,000 subscribers.
>
> Transportation Alternatives's website that receives approximately 400,000 visitors a year;
>
> Brochures about the ride that Transportation Alternatives sends to approximately 100,000 people.

*See* Pl. 56.1 ¶¶ 8, 13–14. Penalizing commercial speech made in connection with these publications far exceeds the permissible reach of the government in seeking to preserve the City's parks. In fact, it is hard to imagine any legitimate justification that would allow the Parks Department to regulate commercial speech that does not effect or take place on its property.[32]

**31.** It is worth noting that "[a]t the Transportation Alternatives NYC Century Bike Tour in September 2001, no banners naming any corporate sponsors were present in Central Park. The only banners present at that event were banners identifying Transportation Alternatives or bearing advocacy messages of our group." 3/22/02 Supplemental Affidavit by John Kaehny, Executive Director of Transportation Alternatives.

**32.** It is possible to hypothesize other reasons for charging higher permit fees to public interest groups that have commercial sponsors. The most obvious reason would be that the City sought to create a fund-raising device for the Parks Department. However, it is well-

established that the "[government's] burden is not satisfied by mere speculation or conjecture." *Edenfield*, 507 U.S. at 770, 113 S.Ct. 1792 (numerous citations omitted). *See also* Def. Mem. at 13 ("The government body must show more than mere speculation or conjecture, but rather that the asserted harm is real and that the regulation will *in fact* alleviate the harm to a material degree.") (emphasis added).

In this case, the government has not asserted that it passed section 2–10 to raise money. *See id.* at 15 ("[T]he City's interest in promulgating 56 RCNY § 2–10, as stated in the Statement of Basis and Purpose, is to provide a framework for the [Parks Department] to assure the safety of parks property and the

In sum, *Central Hudson's* "third and fourth steps coalesce to require 'a reasonable fit between the legislature's ends and the means chosen to accomplish those ends.'" *Anderson,* 294 F.3d at 462. Section 2–10 fails to satisfy this requirement because it does not directly advance the interests asserted by the government and sweeps into its purview speech that the Parks Department has no interest in regulating. The regulation therefore violates the First Amendment.

### B. Analysis of Placing Financial Burdens on Groups Because of Corporate Sponsorship

Section 2–10 allows the Parks Department to charge a group additional fees to obtain a permit "where a for-profit entity is the permittee, primary host, [or] has contributed to underwriting the cost of an event." 56 RCNY § 2–10. Relying upon the Supreme Court's decision in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), Transportation Alternatives argues that this portion of section 2–10 violates the First Amendment. *See* Pl. Mem. at 16–17; Pl. Reply at 5.[33]

In *Bellotti,* the Supreme Court considered the constitutionality of a statute that prohibited corporations from "spend[ing] money to publicize their views on a proposed [state] constitutional amendment that .... would have permitted the legislature to impose a graduated tax on the income of individuals." 435 U.S. at 769, 98 S.Ct. 1407. Because the First Amendment would clearly protect the right of an individual to spend money for such purposes, the case raised the question of "whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection." *Id.* at 778, 98 S.Ct. 1407.

■■■ In holding that the statute violated the First Amendment, the Supreme Court held that the level of protection afforded to certain speech turns on the speech at issue, not on the identify of the speaker. "In the realm of protected

---

continued public usage of parks property for recreational purposes, to preserve public resources associated with the maintenance and upkeep of parks."); Def. 56.1 ¶ 44 (same).

Of course, the government may not impose permit fees on fully-protected First Amendment events for the purpose of generating revenue for the government. *See Nat'l Awareness Found. v. Abrams,* 50 F.3d 1159, 1164–66 (2d Cir.1995). At the same time, it is obvious that the government can impose fees on pure commercial speech (*i.e.,* advertisements) in order to raise money—that is the whole purpose of selling advertisements on, for example, the City's subways and buses.

Whether the government could pass regulations for the sole purpose of raising money for the Parks Department by imposing fees on fully-protected First Amendment activities (*e.g.,* the Bike Tour) because Transportation Alternatives, the Bike Tour's sponsor, advertises its commercial sponsors on Parks Department property is a question that no court has answered. It is worth noting, however, that it may be awkward to charge the public

interest groups—rather than the for-profit company—for such advertising. Determining whether this is a meaningful distinction cannot—and need not—be answered here.

**33.** In its opposition papers, the City appears to misunderstand plaintiff's argument. It responds by arguing that "plaintiff's reliance on [*Bellotti*] is entirely misplaced as [that case] concerned speech by a for-profit corporation on issues of public concern directly affecting the corporation itself." Def. Mem. at 16. "In contrast [to *Bellotti*], the commercial speech at issue here is nothing more than mere advertising—providing an avenue for a commercial entity to inform an event's participants that it has contributed to that event in order to sell its products to that audience." Def. Mem. at 17. *See also* Def. Reply at 5.

But commercial speech is *not* the issue here (as it was in Part V.A., *supra*). Rather, the issue here is whether, under *Bellotti,* the City can impose additional fees on groups that receive funding from for-profit entities.

speech, the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue." *Id.* at 784–85, 98 S.Ct. 1407. As the Supreme Court more recently stated, "government regulation may not favor one speaker over another." *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510.[34]

 In light of *Bellotti,* section 2–10 is patently unconstitutional. The Rule allows the Parks Department to charge higher permit fees based solely on the fact that a for-profit company is underwriting the event. Under the plain language of section 2–10, the City could, for example, impose higher financial burdens on Transportation Alternatives just because for-profit companies have chosen to sponsor its NYC Century Bike Tour even if there is nothing to indicate such sponsorship (*e.g.,* use of companies' marks).[35] "Such power in government to channel the expression of views is unacceptable under the First Amendment." *Bellotti,* 435 U.S. at 785, 98 S.Ct. 1407.

### C. Plaintiff Is Granted Declaratory and Injunctive Relief with Respect to Section 2–10

 In sum, Transportation Alternatives's motion for summary judgment declaring that section 2–10 violates the First Amendment and a permanent injunction of

its enforcement is granted for two reasons. *First,* the City has failed to meet its burden of showing that the fees placed on plaintiff's commercial speech "directly advances the government interest asserted, and ... [are] not more extensive than is necessary to serve that interest." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. *Second,* section 2–10 violates the First Amendment by allowing the Parks Department to charge higher permit fees because a for-profit company is underwriting or sponsoring the event. The issue of whether Transportation Alternatives should also be awarded monetary damages equivalent to the $6,000 permit fee is discussed in Part VII.B., *infra.*

## VI. FIRST AMENDMENT ANALYSIS OF PERMIT FEES CHARGED TO TRANSPORTATION ALTERNATIVES IN 1999 AND 2000

### A. Permit Fees Charged to Transportation Alternatives in 1999 and 2000

Transportation Alternatives also challenges the permit fees that were charged for its 1999 and 2000 Bike Tours. Before section 2–10 was enacted, the Parks Department charged $25 to any group applying for a permit to hold a demonstration (of any size) or a small special event such as a birthday party on Parks Department property.[36] *See* Pl. 56.1 ¶ 31; Def. 56.1

---

**34.** *See also Perry v. Los Angeles Police Dept.,* 121 F.3d 1365, 1371 (9th Cir.1997) ("Once it is decided that the activity here is expressive activity, fully protected by the First Amendment, the fact that plaintiffs are not nonprofit organizations does not affect the level of protection accorded to their speech.").

**35.** Although it is unclear from the record whether Transportation Alternatives was, in fact, charged more for its 2001 permit fee because it received funding from for-profit groups, it does not matter. Regardless of whether Transportation Alternatives has been harmed by this portion of section 2–10, it may nonetheless challenge the regulation under the First Amendment's overbreadth doctrine.

*See, e.g., Vill. of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 633–34, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (holding that fundraising organization had standing under overbreadth doctrine to challenge restrictions on fundraising activity even if restriction did not apply to plaintiff); *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (noting that First Amendment overbreadth doctrine allows plaintiff to bring facial challenge to permit-fee scheme even if application to plaintiff is constitutional).

**36.** For a list of events held between February 1997 and April 2001 for which the Parks

¶ 5. Special events were charged additional fees "if they were promotional events, *had a commercial sponsor,* were fundraisers, or had some extraordinary impact on a park." Pl. 56.1 ¶ 35 (emphasis added). *See also* Affidavit of Eric Peterson ¶ 2.

The additional fees for special events were determined by the Parks Department's marketing office, *id.* ¶¶ 41–42, which relied on the factors described in a publication entitled "Top Ten Considerations in Evaluating Events Held in New York City Parks: A Guide for Determining Contributions," *see* Ex. A to Def. Notice. Those ten considerations were:

(1) What is the impact of the event on the park? Will it affect the normal use of the park?

(2) When and where will the event take place?

(3) Recent and relevant precedent.

(4) Will Parks need to provide production assistance and/or security for the event? What is the total cost to Parks?

(5) How much time will be needed for set-up and break down?

(6) How many people are expected to attend the event?

(7) What is the primary purpose of the event, public benefit or corporate promotion?

(8) What type of product is being promoted?* [*According to general practice the promotion of alcohol and/or tobacco products is prohibited.]

(9) *Is the event consistent with the image of Parks?*

Department charged a permit fee greater than $25.00, see Appendix A (quoting Pl. 56.1 ¶ 62).

(10) Will music or noise interfere with people residing or working near the park?

Pl. 56.1 ¶ 42 (emphasis added). While there was no "mathematical formula" for establishing a fee for a particular special event, staff in the marketing office reviewed each application by considering each of these ten issues. *Id.* ¶ 44.[37]

For Transportation Alternatives's 1999 and 2000 events, the only information the Parks Department has produced about how it arrived at these fees is contained in memoranda that were prepared by the Parks Department at the time the fees were assessed. *See id.* ¶¶ 55–60 (quoting the Parks Department memoranda). For example, the 2000 memorandum states:

**Event Title**
New York City Century Bike Tour

**Participating Sponsors**
Transportation Alternatives and Wildlife Conservation Society. Commercial sponsors and supporters include: Clif Bar, Robert Fader, Ben & Jerry's, Bicycle Habitat, Ritz Hummus, Krispy Kreme, Kontos Pita, Tom Cat Bakery, Metro–Bicycle Stores, Dutch Mill, Chiquita Bananas, and Adam White (Law Office).

**Location**
Start Location: Adam Clayton [Powell] Blvd. Entrance to Central Park, near Harlem Meer and Lenox Ave.
Finish Location: Lenox Ave. entrance to Central Park
Route: Manhattan, Bronx, Queens, Brooklyn, routes of varying mileage (routes are not closed to traffic.)

**Date and Time**
Sunday, September 10, 2000
Riders begin arriving at 5:45AM and will finish returning by 7:30PM.

**Setup/Breakdown**
Setup begins 3:00 AM and breakdown will end by 8:00 PM. Tables will be set up along exit/entrance ramps for: registration, pick up of supplies, and volunteer and marshal check-in

**Contact Name**
Craig Barnes
Transportation Alternatives

**37.** *See also* Peterson Dep. at 128, 130–50, 228–30 (explaining how the Parks Department determined fees for special events), Ex. I to Def. Notice.

115 West 30th Street suite 1207
New York, N.Y. 10001
Tel: 212–629–8080
Fax: 212–629–8334

Contribution
$6,000

*Id.* ¶ 56.

## B. First Amendment Analysis of Fees Charged in 1999 and 2000

 Prior to April 2001, the Parks Department's policy with respect to special events violated the First Amendment for two reasons. The first reason is that additional fees were triggered if, among other things, a group had commercial sponsorship. Although the term "commercial sponsorship" is not defined, the Parks Department memoranda make it clear that "[c]ommercial sponsors and supporters" were for-profit organizations such as Clif Bar and Ben & Jerry's. *See* Pl. 56.1 ¶ 56 (2000 memorandum). There is no question here that Transportation Alternatives was charged additional fees because companies were sponsoring its events. As explained above, given the Supreme Court's decision in *Bellotti*, drawing distinctions between organizations based on for-profit or non-profit sponsorship in determining how much to charge to hold an event on Parks Department property runs afoul of the First Amendment. *See supra* Part V.B.

 In addition, the Parks Department's policy violated the First Amendment because, when it determined a fee, it considered whether "the event [was] consistent with the image of Parks." Pl. 56.1 ¶ 42. "Under this approach, events that involved recreation, physical education, and cultural awareness would be charged reduced fees, all other things being equal."

*Id.* ¶ 48 (citing Peterson Dep. at 165–66). For example, the parties agree that under this criteria "events focusing on trees would be charged lower fees than those focusing on the death penalty." *Id.* ¶ 47 (citing Peterson Dep. at 172–74). "Similarly, events focusing on the politics of New York City would be charged a lower fee than events focusing on the politics of England."[38] *Id.*

Requiring groups to pay more for a permit because their event does not fit the City's image of the park is anathema to the First Amendment. *See supra* Part II.A. Unless they survive the most exacting scrutiny, "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster*, 502 U.S. at 116, 112 S.Ct. 501 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 648–649, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)). Yet, the City has not offered any compelling interests in support of its policy nor explained why this policy is narrowly tailored. *See supra* Part II.A. Accordingly, the Parks Department's policy of considering whether the event is consistent with the "image of Parks" is unconstitutional.

## VII. DAMAGES

### A. Damages Related to Permit Fees

 In addition to seeking declaratory and injunctive relief, Transportation Alternatives has moved to recover the fees it was charged for the 2001, 2000 and 1999 Bike Tours. Because the Bike Tours were large events, a question remains as to

---

**38.** The wide-range of permit fees that can be charged to similar events is made evident by examining some of the fees charged to fundraising walks held at Central Park: Sickle Cell Anemia Walk ($500); National Down Syndrome Buddy Walk ($2,500); Parkinson's Unity Walk ($4,000); National Kidney Foundation Walk ($7,000); Making Strides Against Breast Cancer ($12,000); Gay Men's Health Crisis AIDS Walk ($40,000). *See* Pl. 56.1 ¶ 62. *See also* Appendix A (listing events held between February 1997 and April 2001 for which the Parks Department charged greater than $25).

whether Transportation Alternatives should receive the full fees as damages or, instead, some portion of the fees mitigated by any harm that the Bike Tours may have caused Parks Department property.

With respect to 2001, the Parks Department explained its reasons for assessing the additional fees in a letter dated July 11, 2001:

> Thank you for meeting with us on Thursday, June 28 regarding the NYC Century Bike Tour that you would like to hold on September 9, 2001.
>
> As the specifics of your event are very similar to last year the site fee will remain the same, $6,000. This fee is based, *inter alia,* on the corporate sponsorship of your event including an onsite presence in Central Park and the entrance fee that you charge. If you remove the corporate elements of your event, specifically the Ben and Jerry's presence and the Clif Bar sampling, and make the entrance fee simply a suggested donation, on all your literature including your website, then you will only be required to pay the permit application fee of $25.00 and post the appropriate insurance and bond.
>
> If you have any questions please contact me at 212–360–1379.

Pl. 56.1 ¶ 110 (quoting 7/11/01 Letter from Erica Messing, Marketing and Special Events). This letter makes it clear that the additional fees were charged solely because of Transportation Alternatives's speech and commercial sponsorship, rather than because of any damage that the Bike Tour inflicted on Central Park or other Parks Department property during the Bike Tour and for which the City might reasonably require compensation. Thus, Transportation Alternatives is entitled to the full amount of the additional fees assessed in 2001 ($6,000).

There is no letter or other direct evidence revealing how much the City would have charged Transportation Alternatives in 2000 and 1999 if it had not considered the group's protected speech and activities when assessing its permit fees. Nonetheless, it is appropriate to award damages to Transportation Alternatives equal to the full amount of these fees ($6,000 and $5,500 respectively) for two reasons.

*First,* these permit fees "are separate from insurance requirements the Department may impose on groups seeking to hold events on Parks Department property; are separate from the clean-up bonds, restoration bonds, and security bonds the Department may impose on groups seeking to hold events on Parks Department property; and are separate from the fees for services (such as rental of a stage or cost of an electrician) provided by the Parks Department in conjunction with such events." Pl. 56.1 ¶ 33 (citing Peterson Dep. at 25–26, 170, 464). Because these fees are "required in the event of damage to specific park property, such as destruction of specially planted flower beds, [or] damage to a statute," Def. 56.1 ¶ 45, it is clear that the permit fees were not assessed in order to compensate the Parks Department for any specific harm caused by the Bike Tour. Thus, at most, the fees might be used to recover more general harms caused by large events such as the Bike Tour.

*Second,* and more important, when a party challenges permit fees for infringing on its First Amendment speech or activities, the government bears the burden of proving that all of the fees were legitimate. *See supra* Part II.A.-B. In this case, however, the City has conceded that while it is able to point to factors that it considered in setting a fee, *see* Pl. 56.1 ¶ 42, it is unable to explain how it arrived at a particular fee for the Bike Tour events in 2000 and 1999. *See* Pl. 56.1 ¶¶ 114, 117, 119,

122.[39] Because the City cannot point to any particular fees that were assessed against Transportation Alternatives for legitimate reasons, it cannot sustain its burden of showing why Transportation Alternatives should not be awarded damages equal to the full amount of fees paid for the 2000 and 1999 permits (6,000 and $5,500).

### B. Attorneys' Fees

Under section 1988, "the court, in its discretion, may allow the prevailing party [in a suit brought under 42 U.S.C. § 1983], other than the United States, a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 1988(b). Because such an award would not be unjust under the circumstances, plaintiff's motion is granted. *See New York State Nat. Org. for Women v. Terry*, 159 F.3d 86, 97 (2d Cir.1998) ("There is a presumption that successful civil rights litigants should recover reasonable attorney's fees unless special circumstances would render such an award unjust."); *DiFilippo v. Morizio*, 759 F.2d 231, 234 (2d Cir.1985) (same).

### VIII. CONCLUSION

For the reasons set forth above, Transportation Alternatives's motion for summary judgment is granted in full and the City's motion for summary judgment is denied. The Clerk of the Court is ordered to close this case.

SO ORDERED.

### Appendix A

"Between February 1997 and April 2001 there were at least 199 events for which the Parks Department charged a fee beyond the standard $25.00 for a permit." Pl. 56.1 ¶ 61. Some of the events held between February 1997 and April 2001 for which the Parks Department charged a permit fee greater than $25.00 include:

| Event | Location | Date | Fee |
|---|---|---|---|
| La Mega | Softball field, Highland Park, Bklyn | 24–Jun–01 | $ 5,000 |
| National Down Syndrome [Society] Buddy Walk | Central Park, Great Hill | 22–Oct–00 | $ 2,500 |
| National Kidney Foundation Walk | Central Park | 22–Oct–00 | $ 7,000 |
| Making Strides Against Breast Cancer | Central Park | 15–Oct–00 | $ 12,000 |
| Parkinson's Unity Walk | Central Park | 24–Sep–00 | $ 4,000 |
| Sickle Cell Anemia Walk | Central Park | 23–Sep–00 | $ 500 |
| Cystic Fibrosis Foundation | Central Park, Great Hill | 23–Sep–00 | $ 7,000 |
| NYC Church of Christ Teen Rally | Central Park, East Meadow | 23–Sep–00 | $ 20,000 |
| Doctors Without Borders Refugee Camp | Prospect Park, Van Courtlandt [sic] Park and Central Park | Sep. 16– Oct. 2, 2000 | $ 50,000 |
| SHARE Walk-a-thon | Central Park | 10–Sep–00 | $ 9,000 |
| New York City Century | Central Park, Adam Clayton | | |

**39.** Indeed, the Parks Department cannot explain how it arrived at the fees for any event. *See* Pl. 56.1 ¶¶ 63, 65–70, 72, 74, 77–83, 85–86, 88, 90.

| | | | |
|---|---|---|---|
| Bike Tour | Blvd. and Lenox Avenue entrances | 10–Sep–00 | $ 6,000 |
| Pakistan Zindabad Broadcasting Festival (Pakistani Independence Day) | Battery Park | 12–Aug–00 | $ 5,000 |
| Earthshare Concert | Prospect Park | 3–Aug–00 | $650,000 |
| NYC Metro March for Jesus | 90th Street on East Dr. to Central Park, East Meadow | 17–Jun–00 | $ 25,000 |
| NY Association for New Americans | Battery Park, Central Lawn | 11–Jun–00 | $ 5,000 |
| Society for Preservation of Mississippi Heritage Picnic | Central Park, East Meadow | 10–Jun–00 | $ 3,000 |
| American Diabetes Association Cycling Event (Tour de Cure) | Central Park, East Meadow | 4–Jun–00 | $ 15,000 |
| Buddist [sic] Ray, Inc. Change your Mind Day | Central Park | 3–Jun–00 | $ 6,500 |
| Turkish American Women's Fdn. May Fest | Central Park, Naumberg Bandshell | 29–May–00 | $ 7,500 |
| Tourism Malaysia Pinang Cultural Dance Event | Washington Square Park | 27–May–00 | $ 3,000 |
| GMHC AIDS Walk | Central Park | 21–May–00 | $ 40,000 |
| Festival of Mongolia | Central Park, East Meadow | 19, 20–May–00 | $ 25,000 |
| Earth Day New York | Battery Park | 16–Apr–00 | $ 10,000 |
| Stern MBA Challenge | Central Park, East Meadow | 15–Apr–00 | $ 1,000 |
| Sri Chinmoy Peace Concert | Central Park, East Meadow | 13–Nov–99 | $ 7,500 |
| National Kidney Foundation Walk-a-thon | Central Park | 24–Oct–99 | $ 6,000 |
| Making Strides Against Breast Cancer | Central Park | 15–Oct–99 | $ 11,000 |
| SHARE Walk-a-thon | Central Park | 3–Oct–99 | $ 8,000 |
| National Downs Syndrome Society Buddy Walk | Central Park | 3–Oct–99 | $ 2,000 |
| Parkinson's Unity Walk | Central Park | 26–Sep–99 | $ 3,000 |
| Cystic Fibrosis Foundation Sports Challenge | Central Park, Great Hill | 15–Sep–99 | $ 6,500 |
| New York City Century Bike Tour | Central Park | 12–Sep–99 | $ 5,500 |
| Global Alliance for Intelligent Arts (Drums Around the World) | Battery Park | 22–Aug–99 | $ 4,500 |
| Dalai Lama Event, Gere Publications | Central Park, East Meadow | 15–Aug–99 | $ 7,500 |
| U.S. Army Twilight Tattoo | Central Park | 6–Aug–99 | $ 25,000 |

| | | | |
|---|---|---|---|
| Preservation of Mississippi Heritage Day | Central Park, East Meadow | 12–Jun–99 | $ 2,000 |
| World Tibet Day | Central Park | 10–Jul–99 | $ 1,250 |
| AHRC Walk/Run–A–Thon for the Disabled | Central Park | 6–Jun–99 | $ 7,623 |
| Buddhist Ray Change Your Mind Day | Central Park | 5–Jun–99 | $ 6,000 |
| GMHC AIDS Walk | Central Park | 16–May–99 | $ 40,000 |
| National Kidney Foundation Walk-a-thon | Central Park | 8–Nov–98 | $ 5,000 |
| MTA Arts for Transit | Duffy Square | 2–Nov–98 | $ 1,000 |
| Making Strides Against Breast Cancer | Central Park | 18–Oct–98 | $ 10,000 |
| Parkinson's Unity Walk | Central Park | 27–Sep–98 | $ 2,000 |
| Cystic Fibrosis Foundation Sports Challenge | Central Park, Great Hill | 26–Sep–98 | $ 7,500 |
| New York City Century Bike Tour | Central Park | 12–Sep–98 | $ 5,000 |
| Salute to Israel 50th Anniversary | Central Park, East Meadow | 7–Jun–98 | $ 7,500 |
| GMHC AIDS Walk | Central Park | 17–May–98 | $ 40,000 |
| March of Dimes WalkAmerica | Madison Square, Damrosch, Union Square & Washington Square Park | 26–Apr–98 | $ 15,000 |
| Share–A–Walk | Central Park, Bandshell | 5–Oct–97 | $ 6,500 |
| National Kidney Foundation Walk | Central Park, Bandshell | 21–Sep–97 | $ 5,000 |
| Cystic Fibrosis Foundation Sports Challenge | Central Park, Great Hill | 20–Sep–97 | $ 7,500 |
| New York City Century Bike Tour | Central Park | 7–Sep–97 | $ 2,000 |
| World Music Institute/Music Festival of India | Central Park, Bandshell | 5–Sep–97 | $ 7,500 |

*Id.* ¶ 62.

## Appendix B

"Since the April 2001 promulgation of regulations codified at 56 RCNY § 2–10, there have been at least 50 events for which the Department ... has charged a fee beyond the standard $25.00 for a permit." Pl. 56.1 ¶ 112. Some of the events held after April 2001 for which the Parks Department charged fees greater than $25.00 pursuant to 56 RCNY § 2–10 are the following:

| Event | Location | Date | Fee |
|---|---|---|---|
| Pediatric Cancer Foundation Walkathon | Riverside Park | 22–Apr–01 | $ 1,500 |
| Stern MBA Challenge | Central Park, | | |

| Event | Location | Date | Amount |
|---|---|---|---|
| | East Meadow | 28–Apr–01 | $ 1,000 |
| March of Dimes WalkAmerica | Damrosch Park, Lexington Ave, Madison Square Park, Broadway, Fifth Ave, Madison Ave, 10th Ave | 29–Apr–01 | $ 10,000 |
| American Lung Association Scavenger Hunt | Union Square Park, South Plaza | 5–May–01 | $ 2,000 |
| Turkish Festival: Mayfest | Central Park, Naumberg Bandshell | 13–May–01 | $ 3,000 |
| Boy Scouts of America 5K | Central Park, Lower Loop | 16–May–01 | $ 1,000 |
| Gay Mens Health Crisis AIDS Walk | Central Park | 20–May–01 | $ 40,000 |
| Israeli Day Concert | Central Park, East Meadow | 20–May–01 | $ 12,500 |
| Armenian Church Event | Central Park, East Meadow | 26–27 May–01 | $ 15,000 |
| American Heart Walk | Battery Park | 1–Jun–01 | $ 2,500 |
| Tricycle: Change Your Mind Day | Central Park | 2–Jun–01 | $ 5,500 |
| American Liver Foundation | Riverside Park | 3–Jun–01 | $ 3,000 |
| Russian American Arts Foundation Festival | Battery Park, Central Lawn | 3–Jun–01 | $ 3,750 |
| Military Tattoo | Central Park | 7–Jun–01 | $ 12,500 |
| Mississippi Day Picnic | Central Park | 9–Jun–01 | $ 3,000 |
| Lesbian & Gay Community Services Center Garden Party | John Servaili Playground | 18–Jun–01 | $ 6,500 |
| Festival of Mongolia | Central Park, East Meadow | 23–24–Jun–01 | $ 15,000 |
| La Mega Concert | Highland Park, Softball Field | 24–Jun–01 | $ 5,000 |
| Tour de Cure | Brooklyn Battery Park | 24–Jun–01 | $ 5,000 |
| Korean Festival | Central Park, Dead Road | 30–Jun–01 | $ 1,000 |
| Young Judea Youth Rally | Central Park | 3–Jul–01 | $ 1,000 |
| Tibetan Festival | Battery Park, Central Lawn | 8–Jul–01 | $ 3,750 |
| Burmese Festival | Central Park | 22–Jul–01 | $ 2,500 |
| La Mega Cultural Festival | Dewitt Clinton Park | 29–Jul–01 | $ 7,500 |
| Brazilian Symphony Orchestra Event | Central Park | 7–Sep–01 | $ 10,000 |
| NYC Century Bike Tour | Central Park | 9–Sep–01 | $ 6,000 |

*Id.* ¶ 113.